## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LITTLETON WATER DISTRICT, MASSACHUSETTS, <br><br> *Plaintiff*, <br><br> *v.* <br><br> JUMBO CAPITAL MANAGEMENT, LLC; INVETECH INC.; SETRA SYSTEMS LLC; SYNQOR, INC.; AMRIZE NORTHEAST INC.; HP INC.; HEWLETT PACKARD ENTERPRISE COMPANY; NORTHBRIDGE PARTNERS LLC; NBPII LITTLETON LLC; LML LITTLETON LLC; CURTISS-WRIGHT CORPORATION; CURTISS-WRIGHT CONTROLS, INC.; 30 PORTER LLC; DIAMOND ANTENNA AND MICROWAVE CORPORATION; ARTEMIS CAPITAL PARTNERS III, L.P.; *and* 59P, LLC, <br><br> *Defendants*. | **C.A. No. 1:26-cv-12606** <br><br><br> **CERCLA COMPLAINT** <br> **42 U.S.C. §§ 9607(a) and 9613(f)(1)** |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

COMES NOW, the Plaintiff, Littleton Water District, Massachusetts (hereinafter "Plaintiff" or "Littleton"), and a Complaint against the Defendants, Jumbo Capital Management LLC; Invetech Inc.; Setra Systems LLC; SynQor, Inc.; Amrize Northeast Inc.; HP Inc.; Hewlett Packard Enterprise Company; NorthBridge Partners LLC; NBPII Littleton LLC; LML Littleton LLC; Curtiss-Wright Corporation; Curtiss-Wright Controls, Inc.; 30 Porter LLC; Diamond Antenna and Microwave Corporation; Artemis Capital Partners III, L.P.; and 59P, LLC (hereinafter, collectively, "Defendants"), avers and states as follows:

## INTRODUCTION

1.    The Littleton Water District owns and operates a public water system supplying over 9,000 residential, commercial, and industrial customers in Littleton, Massachusetts in Middlesex County.

2.    Littleton's water supply is derived exclusively from groundwater sources from three general areas: (i) the Beaver Brook Wellfield (Wells 2-1, 2-2, and 2-3), (ii) the Spectacle Pond Well (Well 5), (iii) the Whitcomb Avenue Wells (Wells 1 and Well 3 Wellfield).

3.    These wells draw from a sole-source aquifer system that is hydrologically connected to surrounding surface waters, wetlands, and recharge areas, including Spectacle Pond and the Bennetts Brook watershed.

4.    Littleton's drinking water supply has been, and is being, contaminated by synthetic per- and polyfluoroalkyl substances ("PFAS"), including chemicals that break down into PFAS, that were purchased, consumed, transported, used, processed, mixed, stored, handled, released and/or disposed of by Defendants and/or otherwise released into the environment from Defendant's properties.

5.    PFAS are considered "emerging contaminants" because they are newly recognized as posing significant risks to human health, were not routinely monitored in the past, and until very recently were not regulated.

6.    PFAS have been detected in Littleton's drinking water supply.

7.    In this civil action, Littleton seeks to recover the costs associated with the necessary response to contamination of its water supply wells with PFAS, including but not limited to the costs of removing these contaminants as a result of Defendants' tortious conduct and their release,

remedial costs associated with long-term actions to address these releases, as well as investigation and information gathering costs, groundwater monitoring costs, and other related costs.

8. Littleton further brings this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); to recover compensatory and all other damages and relief, including all necessary funds to compensate Littleton for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS, including PFOA, and PFOS from public water supplies; as well as periodic sampling of groundwater; and for such other damages and relief the Court may order.

9. Upon information and belief, Defendants utilized materials containing PFAS, and other substances that transform into PFAS, in their business operations, and who either tortiously or through ordinary operations used, released, stored, handled, and/or disposed of PFAS, including PFOA and PFOS, and materials containing these contaminants in such a manner that has caused PFAS to migrate into and exist in Littleton's drinking water, thereby damaging and injuring Littleton.

10. Defendants as the responsible parties, and not the Littleton Water District, its taxpayers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of PFAS from its drinking water supply.

11. Defendants are jointly and severally responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Littleton, as alleged, either through Defendants' own

3

conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**JURISDICTION AND VENUE**

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).  Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution. The Littleton Water District brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

13.     This Court has personal jurisdiction over Defendants by virtue of each Defendant's regular and systematic contacts with Massachusetts, including, among other things, conducting business and/or owning property in Massachusetts, and because they have the requisite minimum contacts with Massachusetts necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

14.     Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Littleton's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

**FACTUAL BACKGROUND**

**A.     PFAS and Their Risk to Public Health**

15.     Per- and polyfluoroalkyl substances ("PFAS") are a large class of synthetic fluorinated chemical compounds containing strong carbon–fluorine bonds. Their carbon–fluorine bond is among the strongest chemical bonds in nature and gives PFAS unique chemical properties,

including resistance to heat, oil, water, and grease. Because of these properties, PFAS have been widely used for decades in numerous industrial, commercial, and consumer applications, including electroplating operations, industrial coatings, non-stick and corrosion-resistant surfaces, stain-resistant textiles, petroleum production processes, and other products designed to resist grease, oil, and water. Certain PFAS, including perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), are among the most studied members of this class and are currently designated as hazardous substances under CERCLA.

16.    Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations. For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to one part per million. Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion. PFAS are an order of magnitude smaller. PFAS are measured in nanograms per liter; one nanogram per liter is approximately equivalent to one part per trillion ("ppt"). To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

17.    PFAS are commonly released into the environment from industrial facilities that manufacture, use, handle, or dispose of PFAS-containing materials. Releases may occur through multiple pathways, including air emissions, industrial wastewater discharges, spills, stormwater runoff, waste disposal practices, and the treatment, handling, storage, or disposal of PFAS-containing wastes.

18.    Due to the strength of the carbon–fluorine bond, PFAS are extremely resistant to degradation by sunlight, water, or biological processes. As a result, PFAS persist for long periods

of time in environmental media, particularly in surface water and groundwater. Because they remain in the environment for many years or decades, PFAS are widely referred to as "forever chemicals."

19.     PFAS have been used in numerous applications and industries, including: packaging, paper, and cardboard; adhesives; coatings, wax, paint, varnish, and inks; plastic and metal etching; metal plating and finishing; plastics, resins, and rubber; recycling and material recovery; refrigerants; semiconductor industry; and textiles, among others.

20.     According to the Commonwealth of Massachusetts, sources of PFAS in manufacturing and industrial use are not always obvious and frequently not apparent from the face of a facility's primary business activities.  PFAS are commonly incorporated as additives, processing aids, surface treatments, lubricants, dispersants, and coatings in a wide range of industrial processes and products, including those that do not outwardly appear to involve fluorinated chemistry. As a result, facilities may handle, use, and release PFAS even where such use is not expressly disclosed in permits, public filings, or product descriptions.

21.     PFAS are also highly mobile in the environment. Many PFAS compounds readily dissolve in water and migrate through soils into groundwater aquifers and surface water systems. Many PFAS compounds, including PFOA and PFOS, are highly persistent and capable of migrating through groundwater and surface-water systems. PFAS deposited onto soils can leach downward into groundwater and migrate with groundwater flow, while PFAS discharged directly to rivers can travel very long distances downstream.

22.     PFAS have been found to travel over 100 miles in rivers like the Cape Fear River, Tennessee River, and the Mississippi River. River velocity allows contaminants like PFAS to move tens of miles per day.

23.     Scientific and regulatory authorities recognize that PFAS contamination often originates from industrial facilities that emit PFAS into the atmosphere or discharge PFAS-containing wastewater. Air emissions of PFAS can travel through the atmosphere and subsequently deposit onto nearby land or surface waters through wet or dry deposition. Once deposited on land, PFAS can infiltrate soils and migrate downward into groundwater aquifers. PFAS deposited directly onto rivers, lakes, or reservoirs dissolve in the water column and can be transported downstream to drinking water intakes and other sensitive receptors, such as groundwater wells near river relying on infiltration of river water.

24.     PFAS contamination can also occur when PFAS-containing industrial wastewater or stormwater is discharged into rivers or other surface waters. Because PFAS are persistent and mobile in aquatic environments, once discharged they can remain in the water column, migrate downstream, and infiltrate connected groundwater systems, including riverbank and alluvial aquifers used as drinking water sources.

25.     Conventional drinking water treatment processes are largely ineffective at removing PFAS from water once contamination occurs. As a result, when PFAS enter a drinking water source, they often persist through treatment processes and remain present in finished drinking water delivered to consumers.

26.     Exposure to PFAS has been linked to numerous adverse human health effects. Scientific studies and evaluations by federal health agencies—including the United States Environmental Protection Agency ("EPA"), the Agency for Toxic Substances and Disease Registry ("ATSDR"), and other public health authorities—have identified associations between PFAS exposure and a variety of serious health outcomes.

27.    Epidemiological studies have linked exposure to certain PFAS, including perfluorooctanoic acid (PFOA) and PFOS, to kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, and elevated cholesterol levels, as well as pregnancy-induced hypertension and other developmental impacts.

28.    Other research has identified associations between PFAS exposure and immune system effects, including reduced vaccine response, changes in liver enzymes, increased cholesterol, developmental effects in fetuses and children, and reproductive effects such as preeclampsia and reduced birth weight.

29.    PFAS are also known to bioaccumulate in living organisms, including humans. Unlike many persistent pollutants that accumulate in fatty tissue, PFAS bind to proteins in blood and organs. Once ingested—such as through drinking water—PFAS can remain in the human body for years. Repeated exposure to PFAS through contaminated drinking water can therefore lead to significant accumulation of these chemicals in the body over time.

30.    Because PFAS accumulate in the body and persist in environmental media, long-term exposure—even at very low concentrations—can increase the risk of adverse health outcomes. Public health authorities have concluded that exposure to PFAS in drinking water may contribute to cancer, immune system dysfunction, endocrine disruption, developmental effects in infants and children, liver damage, and other serious health conditions.

31.    The United States Environmental Protection Agency (EPA) has found that PFAS can be released during the manufacturing process through spills, emission vectors, and runoff, and as a component of industrial wastewater and solid waste.

32.    PFAS contamination frequently occurs as a commingled mixture of multiple PFAS compounds originating from one or more industrial sources. The presence of multiple PFAS

compounds in a drinking-water source does not permit attribution of contamination to a single source at the pleading stage, and contamination from multiple facilities may combine within a common groundwater plume, aquifer, surface-water body, or drinking-water source.

33.     PFOS, PFOA, perfluoroheptanoic acid (PFHpA), perfluorohexanoic acid (PFHxA), and perfluorohexanesulfonic acid (PFHxS) are among the 29 contaminants now being monitored under EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), a rule EPA promulgated under the Safe Drinking Water Act.   This rule is part of a federal initiative to collect data on unregulated contaminants in public drinking water systems, and in particular "emerging contaminants." The goal is to determine the prevalence, concentration, and human health impact of these contaminants and assess whether future regulation of them is necessary to protect public health.

34.     EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.

35.     Scientific studies and regulatory agencies have identified adverse health effects associated with numerous PFAS compounds, including PFOA, PFOS, PFNA, PFHpA, PFHxS, and others. Reported effects include cancer, immune-system impacts, developmental effects, liver toxicity, thyroid impacts, reproductive harms, and elevated cholesterol.

36.     On October 2, 2020, the Massachusetts Department of Environmental Protection ("MassDEP") adopted the Massachusetts Maximum Contaminant Level ("MMCL") of 20 ppt for the sum of six PFAS, which is applicable to community and non-transient non-community drinking water systems, with the purpose of protecting against adverse health effects for all people consuming the water. The regulated six PFAS, which are collectively called "PFAS6," are PFOS,

9

PFOA, PFHxS, perfluorononanoic acid ("PFNA"), PFHpA, and perfluorodecanoic acid ("PFDA").

37.    Due to the persistence, mobility, and potential health risks associated with PFAS exposure, federal regulators have also taken significant steps to address PFAS contamination in drinking water. In April 2024, EPA issued the first national drinking water standards for certain PFAS under the Safe Drinking Water Act, including maximum contaminant levels of 4 parts per trillion ("ppt") for both PFOA and PFOS, reflecting EPA's determination that extremely low concentrations of these chemicals in drinking water pose risks to human health.  On May 14, 2025, the Trump Administration announced that EPA would retain these low drinking water standards for PFOA and PFOS.

38.    EPA has also formally recognized the dangers posed by PFAS releases under federal environmental law. Effective July 9, 2024, EPA designated both PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., after determining that these chemicals may present a substantial danger to public health or the environment when released.  Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

**B.    PTFE Use and Releases**

39.    PTFE, or polytetrafluoroethylene, is a fluoropolymer commonly sold under the Teflon™ trade name. Teflon is the best-known brand associated with PTFE, and PTFE-based fluoropolymers have long been used in industrial applications requiring unusual chemical resistance, heat resistance, dielectric stability, lubricity, and low friction. Authoritative sources identify PTFE/Teflon as widely used across aerospace, communications, electronics,

semiconductor, wire-and-cable, tubing, sealing, and other industrial applications of the kind carried on by the Defendants, as described below.

40.     Historically, PFOA and closely related PFAS were used as processing aids in the manufacture of PTFE and other fluoropolymers, resulting in the presence of residual PFOA, related PFAS, and precursor compounds associated with fluoropolymer materials and products in PTFE. Accordingly, industrial facilities like those described below that used PTFE/Teflon and related fluoropolymer materials—including facilities engaged in electronics, aerospace, microwave, and communications manufacturing—foreseeably introduced PFAS-bearing materials and wastes onto their sites.

41.     Once present at such facilities, PTFE and fluoropolymer-containing materials are subject to routine industrial handling, including cutting, machining, abrasion, cleaning, thermal processing, use, storage, and disposal. These activities generate wastes and emissions capable of releasing PFAS, including PFOA and related compounds, through multiple pathways, including air emissions, fugitive dust, wastewater discharges, stormwater runoff, and disposal of solid wastes such as scrap materials, spent components, contaminated wipes, and filters. In addition, heating or thermal processing of PTFE-containing materials can generate fluorinated degradation products and associated emissions.

42.     These release pathways make it plausible and foreseeable that the facilities described below that used and/or are using PTFE/Teflon and related fluoropolymer materials discharged PFAS, including PFOS, into the surrounding environment, including soil, groundwater, and surface water, from which such contaminants can migrate and contaminate Littleton's drinking water supply.

**C.    The Littleton Water District's Public Water Supply and Its Vulnerability to Contamination**

43.    Littleton owns and operates a public drinking water system (MassDEP PWSID No. 2158000) that supplies potable water to more than 9,000 residents and businesses through thousands of service connections.

44.    Littleton's water supply is derived exclusively from groundwater sources, including nine municipal wells: (i) the Beaver Brook Wellfield (Wells 2-1, 2-2, and 2-3), (ii) the Spectacle Pond Well (Well 5), and (iii) the Whitcomb Avenue Wells (Wells 1 and the Well 3 wellfield)[1].

45.    Littleton's municipal wells draw water from highly permeable sand-and-gravel aquifers and associated recharge areas that are hydrologically connected to surrounding wetlands, streams, ponds, and groundwater resources. MassDEP has identified these recharge areas as the primary source of water contributing to the Town's public water supply wells.

46.    The Spectacle Pond Well is particularly vulnerable to contamination because it operates as a groundwater–surface water interaction system, whereby pumping induces infiltration of pond water through sediments into the aquifer. Hydrogeologic analyses have determined that a substantial portion of water withdrawn at this well consists of induced recharge from Spectacle Pond, creating a direct pathway for contaminants present in surface water or adjacent land areas to enter the drinking water supply.

47.    Littleton's municipal wells are located within delineated wellhead protection areas, including Zone I protection areas and Zone II recharge areas. MassDEP defines Zone II areas as the primary recharge areas contributing groundwater to public water supply wells and establishes their boundaries through hydrogeologic studies approved by MassDEP. Recharge areas include

---

[1] The Well 3 Wellfield contains four (4) shallow groundwater wells.

land and hydrologically connected surface-water features that contribute water to municipal wells. Accordingly, contaminants released within Zone II areas—including contaminants released to soils, groundwater, streams, wetlands, tributaries, ponds, stormwater systems, septic systems, and other environmental media— migrate through groundwater flow, induced infiltration, surface-water interaction, and related hydrologic processes before reaching municipal drinking-water wells. That is, a Zone II wellhead protection area represents the area of an aquifer contributing groundwater to a public drinking-water supply well under pumping conditions. Contaminants released within or hydraulically connected to such areas are expected to migrate toward and impact those public water supplies.

48.    MassDEP has determined that Littleton's public water supply wells are located in aquifers with a high vulnerability to contamination due to the absence of hydrogeologic barriers, such as confining clay layers, that would otherwise impede contaminant migration. Because the aquifer is composed of permeable geologic materials that readily transmit groundwater, contaminants released within recharge areas may migrate through soils and groundwater toward municipal drinking-water wells.

49.    As MassDEP explains, the aquifer underlying Littleton is composed of permeable materials that readily transmit groundwater, allowing contaminants released at or near the surface to migrate rapidly through soils and groundwater into public supply wells.

50.    This high susceptibility is exacerbated by the presence of numerous industrial, commercial, and transportation-related land uses within Littleton's recharge areas, including facilities that manufacture, use, store, handle, release, or dispose of hazardous substances and PFAS-containing materials.

51.     Littleton's Source Water Assessment and Protection ("SWAP") report identifies numerous high-threat contaminant-generating activities within municipal wellhead protection areas, including electronics and electrical manufacturing facilities, hazardous materials storage and handling operations, industrial parks, machine and metalworking operations, RCRA-regulated facilities, transportation corridors, industrial wastewater sources, and other industrial activities capable of releasing contaminants to groundwater.

52.     MassDEP has specifically recognized septic systems and floor drains leading directly to the ground as potential pathways through which hazardous materials may enter groundwater supplying municipal drinking-water wells. MassDEP therefore recommends controls regulating floor drains and disposal practices within wellhead protection areas.

53.     MassDEP has assigned Littleton's water supply system a high susceptibility ranking because of the presence of industrial, commercial, transportation, and hazardous-material-related land uses within municipal recharge areas. MassDEP has specifically identified electronics and electrical manufacturing facilities, hazardous materials storage, industrial parks, machine and metalworking operations, transportation corridors, and RCRA-regulated facilities as potential sources of groundwater contamination within Littleton's wellhead protection areas

54.     These sectors have been identified by EPA, MassDEP, and other regulatory authorities as industries with known or potential PFAS use, handling, storage, disposal, and release pathways, including the use of fluorinated surfactants, fluoropolymer coatings, lubricants, processing aids, and other fluorinated chemicals.

**D.      PFAS Contamination of Littleton's Drinking Water Supply**

55.     As a result of Defendants' conduct, Littleton's drinking water supply has been contaminated with PFAS, including PFOA and PFOS.

56.    The contamination has impaired and continues to impair Littleton's water resources, interfered with Littleton's use and enjoyment of its property, and imposed substantial costs necessary to ensure the continued provision of safe drinking water.

57.    Absent abatement and remediation, PFAS contamination will persist indefinitely in the aquifer and will continue to threaten the health, safety, and welfare of Littleton's residents.

58.    Monitoring conducted by Littleton has repeatedly detected PFAS, including PFOA and PFOS, in municipal supply wells serving the Town's drinking-water system.

59.    Littleton's public-water-supply monitoring records document repeated detections of PFOA and PFOS in multiple municipal production wells serving the Town's drinking-water system. The following table summarizes representative concentrations reported from those wells, expressed in parts per trillion ("ppt"):

| Municipal Production Well | Highest Reported PFOA (ppt) | Highest Reported PFOS (ppt) | Highest Reported PFAS 6 (ppt) |
|---|---|---|---|
| Spectacle Pond Well 5 | 13.1 | 8.05 | 28.86 |
| Whitcomb Well 1 | 10.9 | 4.93 | 20.03 |
| Whitcomb Well 3 | 4.35 | 2.76 | 7.06 |
| Beaver Brook Well 2-1 | 5.2 | 3.5 | 8.70 |
| Beaver Brook Well 2-2 | 4.2 | 2.3 | 6.50 |
| Beaver Brook Well 2-3 | 2.2 | 1.4 | 2.20 |

60.    These concentrations were reported during routine monitoring of Littleton's municipal drinking-water system and demonstrate the presence of PFOA and PFOS in multiple public-water-supply sources across the Town.

61.    These PFAS sampling results demonstrate repeated detections of PFOA and PFOS in multiple wells, including:

   a.  PFOA concentrations exceeding 13 ppt and PFOS concentrations of similar magnitude at the Spectacle Pond Well;

   b.  persistent detections of PFOA and PFOS in Beaver Brook wells; and

   c.  elevated concentrations in Whitcomb Avenue wells.

62.    Littleton's reported PFAS detections have exceeded, and in some instances continue to exceed, applicable federal and state drinking-water standards, including EPA's Maximum Contaminant Levels of 4 ppt for PFOA and PFOS.

63.    The presence of PFAS in multiple municipal wellfields located in different portions of Littleton is consistent with widespread environmental contamination and ongoing migration through interconnected groundwater and recharge systems rather than a single isolated release.

64.    In its 2024 Consumer Confidence Report, Littleton reported PFAS6 concentrations of approximately 9.01 ppt within its public water system, confirming the continued presence of PFAS contamination in water supplied to residents and businesses. Littleton's Consumer Confidence Report identifies industrial and manufacturing discharges and emissions as recognized sources of PFAS contamination in drinking water.

65.    PFAS6 concentrations at the Spectacle Pond Well reached approximately 28.86 ppt, substantially exceeding Massachusetts' drinking-water standard of 20 ppt. PFAS6 concentrations at Whitcomb Well 1 reached approximately 20.03 ppt. Similar PFAS detections occurred throughout the Beaver Brook and Whitcomb wellfields. These detections demonstrate that PFAS contamination is present across Littleton's municipal groundwater supply system rather than being confined to a single isolated location.

66.    Given the hydrogeologic characteristics of Littleton's aquifer, including high permeability, shallow groundwater conditions, and strong hydraulic connectivity to recharge areas,

16

PFAS released within Zone II areas predictably migrate to and contaminate municipal supply wells.

67. Littleton maintains an extensive source-water protection program that includes environmental audits, groundwater monitoring, and more than one hundred monitoring locations at industrial and commercial properties throughout the community. Despite these efforts, PFAS contamination continues to be detected within the Town's drinking-water system.

**E.      Littleton's Response Actions**

68. Littleton has incurred and continues to incur necessary response costs to investigate, monitor, assess, characterize, contain, treat, remove, mitigate, and otherwise respond to releases and threatened releases of hazardous substances, including PFOA and PFOS, affecting its drinking-water supply system. Such costs include groundwater monitoring, environmental investigation, water-quality testing, engineering evaluation, treatment-system construction and operation, infrastructure improvements, and related response activities necessary to protect public health and maintain compliance with applicable drinking-water standards.

69. Upon detection of elevated PFAS concentrations, including exceedances of regulatory thresholds, Littleton was forced to remove the Spectacle Pond Well from service and implement blending protocols to reduce PFAS concentrations in finished drinking water.

70. These measures were necessary to protect public health and maintain compliance with applicable drinking water standards but resulted in reduced system capacity and increased operational complexity.

71. Littleton has undertaken, and continues to undertake, substantial response actions, including:

a.  Increased PFAS Monitoring and Sampling: Littleton has conducted and continues to conduct monitoring and sampling of PFAS contamination across its drinking water supply, and distribution system, including increased sampling frequency, and installation of monitoring wells to delineate the nature, extent, source, and migration of PFAS contamination within and adjacent to the Town's wellhead protection areas.

b.  Whitcomb Avenue Water Treatment Plant: Littleton has designed, constructed, and brought online a new water treatment plant at the Whitcomb Avenue well site (the "Whitcomb Avenue WTP") to treat PFAS-contaminated source water to levels compliant with applicable state and federal drinking water standards. The water treatment plant incorporates a combination of biological treatment and granular activated carbon ("GAC") filtration. Littleton incurs ongoing operation and maintenance costs, including but not limited to GAC vessel replacement and disposal.

c.  Raw Water Transmission Line - Spectacle Pond and Whitcomb Avenue WTP: Littleton constructed a raw-water transmission line connecting the Spectacle Pond Well to the Whitcomb Avenue WTP so that PFAS-affected source water could be conveyed for treatment prior to distribution to the public.

d.  Trumbull Well Development: Littleton has undertaken the development of a new municipal drinking water supply well on Taylor Street (the "Trumbull Well"), as part of its efforts to identify and develop alternative water supply sources in response to the impairment of existing supply wells by PFAS contamination. Tests show PFAS in this well and expects it to be treated via the Whitcomb Avenue WTP.

18

In connection with these efforts, Littleton conducted extended pumping tests and evaluations of additional groundwater sources capable of supplying substantial additional drinking-water capacity to replace or supplement sources impaired by PFAS contamination.

e.  Water Main Extension — Whitcomb Avenue WTP to Boxborough: Littleton has nearly completed the design and construction of a water main extending from the Whitcomb Avenue WTP to the Town of Boxborough, Massachusetts, as part of a regional water supply interconnection strategy.

f.  Engineering Evaluation and Design of Treatment Systems: Littleton has incurred and continues to incur costs for engineering evaluation, feasibility assessment, and design of PFAS treatment systems across its water supply infrastructure.

g.  Future Treatment Plant: Littleton has determined that an additional PFAS treatment facility will be required to address contamination at remaining affected source water locations not currently served by the Whitcomb Avenue WTP.

h.  Infrastructure Modifications and System Operations: Littleton modified its water supply infrastructure and system operations — including blending protocols, and operational adjustments — as a temporary measure to manage PFAS contamination and maintain finished water PFAS levels in compliance with applicable drinking water standards while longer-term treatment solutions are implemented.

72.  Prior to development of additional water-supply infrastructure, PFAS contamination had been identified in Littleton's existing water sources, and emergency treatment measures were required to maintain affected wells in service. State environmental review records

19

further recognized the need for additional and alternative water-supply capacity and treatment infrastructure in response to PFAS contamination affecting the Town's existing sources.

73.    Conventional drinking water treatment processes do not remove PFAS, requiring the installation of specialized and costly treatment technologies.

74.    Littleton's response actions were necessary to maintain a reliable drinking-water supply in the face of PFAS contamination. By 2023, PFAS contamination was limiting withdrawals from the Spectacle Pond Well, requiring continued operational restrictions and implementation of treatment infrastructure. During this period, Littleton supplemented its drinking-water supply through an interconnection with the Town of Westford while treatment and supply improvements were being completed.

75.    As a direct and proximate result of PFAS contamination, Littleton has incurred and will continue to incur substantial response costs, including investigation, testing, design, construction, operation, maintenance, and replacement costs, and long-term system management. These response actions were undertaken in response to releases and threatened releases of hazardous substances affecting Littleton's drinking-water supply, were necessary to protect public health and the environment, and have been, and will be, consistent with the National Contingency Plan.

76.    Littleton has incurred millions of dollars in response costs to date and is expected to continue incurring millions more for decades.

**F.    Causation and Foreseeability**

77.    PFAS contamination of Littleton's water supply is the direct and foreseeable result of releases of PFAS from industrial, commercial, and waste-handling operations located within and upgradient of Littleton's wellhead protection areas.

78. Defendants knew, or in the exercise of reasonable care should have known, that:

a. PFAS compounds are highly persistent, mobile, and resistant to degradation;

b. releases of PFAS to soil, groundwater, surface water, or air would result in long-distance environmental transport; and

c. releases within Zone II recharge areas would contaminate public drinking water supplies.

79. Defendants further knew or should have known that Littleton's aquifer system lacked natural barriers to contaminant migration and was therefore particularly vulnerable to contamination.

80. Despite this knowledge, Defendants released, disposed of, discharged, emitted, and/or otherwise allowed PFAS, including PFOA and PFOS, to enter the environment, from which those substances migrated through groundwater and surface water pathways into Littleton's drinking water supply wells.

## G. DEFENDANTS' PFAS USE, RELEASES, AND MIGRATION TO LITTLETON'S WATER SUPPLY

81. Each Defendant owned, or owns, operated, or otherwise controlled one or more facilities located within the Zone II recharge areas, wellhead protection areas, and/or hydrologically connected upgradient areas of Littleton's public drinking water supply wells.

82. Through these operations, Defendants used, handled, stored, manufactured, generated, released, and disposed of PFAS and PFAS-containing materials.

83. Defendants released PFAS into the environment through multiple, well-recognized pathways, including but not limited to:

a. spills and leaks of PFAS-containing materials to soils and subsurface;

21

b. discharges of PFAS-containing wastewater to surface waters, groundwater, or infiltration systems;

c. releases through sanitary sewer systems, including leakage and exfiltration to surrounding soils and groundwater;

d. disposal of PFAS-containing solid waste, sludge, and residuals, resulting in leaching to groundwater and surface water;

e. air emissions and atmospheric deposition, whereby PFAS emitted during industrial processes settle onto land and water surfaces; and

f. stormwater runoff transporting PFAS from industrial surfaces, storage areas, and waste handling locations into surface water bodies and groundwater recharge zones.

84. Each of these pathways is recognized by EPA and state regulators as a significant mechanism by which PFAS migrate through the environment and contaminate drinking water sources.

85. Given the hydrogeologic characteristics of Littleton's aquifer system, including high permeability, shallow groundwater conditions, and direct hydraulic connection to recharge areas and surface waters, PFAS released from Defendants' facilities predictably migrated through soil, groundwater, and surface water pathways into Littleton's public drinking water wells.

86. The presence of PFAS, including PFOA and PFOS, across multiple municipal wellfields is consistent with contamination migrating from multiple industrial sources located within recharge areas, capture zones, and hydrologically connected upgradient locations. The timing and persistence of PFAS detections in Littleton's water supply are consistent with both ongoing releases and historical, legacy contamination from Defendants' operations, including

continuing leaching from contaminated soils, groundwater plumes, building infrastructure, wastewater systems, and waste-disposal areas.

87.    Defendants are responsible for the contamination and resulting harm described herein, and equity and law require that Defendants—not Littleton, its ratepayers, or the public— bear all costs of investigation, remediation, treatment, and long-term management of PFAS contamination.

## THE PARTIES

### Plaintiff

88.    **Plaintiff LITTLETON WATER DISTRICT, MASSACHUSETTS** ("Littleton") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 39 Ayer Road, Littleton, Massachusetts. Littleton owns, operates, and maintains the Town's public drinking-water system, including two water-treatment facilities and nine groundwater supply wells, and is responsible for providing safe and reliable drinking water to residents and businesses within Littleton and portions of Boxborough.

### Defendants

89.    The Defendants identified below are current and former owners, operators, arrangers, transporters, and other responsible parties associated with facilities located within Littleton's wellhead protection areas, Zone II recharge areas, groundwater capture zones, and other hydrologically connected areas contributing water to Littleton's public drinking-water supply.

90.    Upon information and belief, Defendants used, manufactured, handled, stored, distributed, released, and/or disposed of PFAS-containing materials at their respective facilities and contributed to the PFAS contamination affecting Littleton's groundwater, aquifer system, and public drinking-water supply.

91.     The following facility-specific allegations describe the ownership, operations, PFAS use, release mechanisms, migration pathways, and resulting contamination attributable to each Defendant.

**A.      Swanson Road Facility PFAS Releases and Migration**

92.     Certain defendants owned, operated, and/or controlled industrial and commercial activities at 155 and 159 Swanson Road in Boxborough, Massachusetts (the "Swanson Road Facility"), where PFAS-containing materials, including products containing PFOA, were used, handled, and discharged.

93.     At all relevant times, tenants at the Swanson Road Facility used PFAS-containing products, including approximately 100 gallons per year of floor polish containing PFOA, and disposed of residual PFAS-containing wastewater through an on-site septic system.

94.     The septic system—including septic tanks, dosing chambers, and leach fields—received PFAS-laden wastewater and discharged those contaminants directly into the subsurface environment, resulting in releases of PFAS to soil, overburden groundwater, and bedrock aquifers.

95.     Sampling confirmed that PFAS concentrations in septic system contents were highly elevated, including PFAS6 concentrations of approximately 770 ppt, establishing the septic system as a primary and ongoing source of PFAS contamination.

96.     Groundwater sampling detected PFAS at concentrations exceeding Massachusetts regulatory standards, including PFAS6 concentrations of approximately 32.8 ppt in monitoring well GW-5, exceeding the applicable 20 ng/L reportable concentration for MassDEP.

97.     PFAS contamination was also detected in on-site public water supply wells at concentrations exceeding Massachusetts regulatory standards, including concentrations of approximately 35.9 ppt and 28.1 ppt in PWS wells 2037018-01G and 2037018-02G, respectively.

98.    The relative composition and proportional distribution of PFAS compounds detected in the septic system, monitoring wells, and public water supply wells correlate, confirming that PFAS released from the septic system migrated through groundwater and impacted potable water supply wells.

99.    Massachusetts regulators determined that these conditions constitute a Condition of Substantial Release Migration ("SRM"), including releases to groundwater that have been or are likely to be detected in water supply wells.

100.    PFAS contamination has migrated beyond the boundaries of the Swanson Road Facility and into nearby private drinking water wells.

101.    Sampling of private residential wells within approximately 500 feet of the Swanson Road Facility detected PFAS6 concentrations of approximately 5.27 ppt and 11.9 ppt at residences on Whitcomb Road, confirming off-site migration of PFAS from the Swanson Road Facility.

102.    The presence of PFAS in these private drinking water wells constitutes a Critical Exposure Pathway ("CEP"), requiring the provision of bottled water and demonstrating actual human exposure to PFAS released from the Swanson Road Facility.

103.    These detections confirm that PFAS released from the Swanson Road Facility migrated through groundwater pathways beyond the site and impacted downgradient receptors.

104.    The Swanson Road Facility is located on a sloping terrain where groundwater flows generally northwest toward wetlands and surface water features that act as discharge zones for contaminated groundwater.

105.    PFAS, including PFOA and PFOS, released from this facility to the subsurface migrated through shallow overburden and deeper fractured bedrock systems, including fracture networks that facilitate both lateral and vertical contaminant transport.

106.    Groundwater discharging from the Swanson Road Facility enters adjacent wetlands and an unnamed tributary, which serve as conduits for PFAS transport into surface water systems.

107.    Surface water sampling confirmed the presence of PFAS in wetland and surface water areas associated with the Site, with concentrations ranging up to approximately 23.3 ppt PFAS6.

108.    PFAS contamination was detected at multiple surface water sampling locations (SW-1 through SW-9), including locations downgradient of the Swanson Road Facility and across Swanson Road, confirming lateral transport through surface water systems.

109.    The highest detected surface water concentrations were observed in areas hydraulically connected to the Swanson Road Facility and along the pathway toward Beaver Brook.

110.    Beaver Brook is located approximately 400 feet northwest of the Swanson Road Facility and flows in a northerly direction toward Littleton, Massachusetts.

111.    In contrast, Elizabeth Brook lies to the southeast and flows in a southerly direction, and boundary sampling confirms that PFAS contamination is associated with the Beaver Brook drainage system rather than the Elizabeth Brook watershed.

112.    These hydrologic conditions establish a continuous and foreseeable pathway for PFAS released from the Swanson Road Facility to migrate northward through surface water and hydrologically connected groundwater systems toward Littleton.

113.    PFAS released from the Swanson Road Facility were a substantial contributing factor in causing contamination of groundwater and surface water systems, including drinking water sources downgradient of the Swanson Road Facility, such as Littleton.

114.    Defendants knew or should have known that PFAS are highly persistent, mobile, and water-soluble contaminants that readily migrate through groundwater and surface water systems, and that disposal of PFAS-containing wastes to septic systems would result in off-site contamination.

115.    Despite such knowledge, Defendants failed to prevent, contain, or remediate PFAS releases and failed to warn affected downstream water users.

116.    As shown on mapping of the Littleton water supply system, Beaver Brook flows north to northeast and has a direct hydraulic connection with Zone II wellhead protection areas serving Littleton's municipal drinking water wells. Specifically, water from Beaver Brook contributes to the aquifers supplying water for Littleton's Beaver Brook Wells, specifically Well 1 and Well Field 3, and Wells 2-1 and 2-3.

117.    PFAS, including PFOA and PFOS, have been, and are being, released from the Swanson Road Facility to Beaver Brook via groundwater, wetlands, and tributary pathways and entered Littleton's groundwater recharge system, migrating into municipal supply wells through established capture zones.

118.    Because PFAS are highly mobile, persistent, and resistant to degradation, contaminants introduced into Beaver Brook and associated recharge areas remain in solution and are readily transported through groundwater into Littleton's water supply wells.

119.    Accordingly, PFAS releases from the Swanson Road Facility that migrated into Beaver Brook and hydraulically connected surface water systems were foreseeably drawn into Littleton's Zone II capture areas, including those of the Beaver Brook Wells, and contributed to contamination of the Town's drinking water supply wells.

120.    **Defendant JUMBO CAPITAL MANAGEMENT, LLC** ("Jumbo Capital") is a Massachusetts limited liability company. Its resident agent is Jay Hirsh, 1900 Crown Colony Drive, 4th Floor, Quincy MA 02169.

121.    Jumbo Capital is the current owner of the Swanson Road Facility and acquired the facility by quitclaim deed on or about November 22, 2016, for consideration of approximately $9,675,000, recorded at the Middlesex South Registry of Deeds at Book 68467, Page 288.

122.    At all relevant times since its acquisition, Jumbo Capital owned, leased, managed, controlled, and derived financial benefit from the Swanson Road Facility, a multi-tenant industrial property used for manufacturing, engineering, and related commercial activities conducted by, inter alia, Setra Systems, Inc., Invetech Inc., and SynQor, Inc.

123.    Jumbo Capital owned, controlled, and was responsible for the operation, maintenance, and oversight of core infrastructure at the Swanson Road Facility, including on-site wastewater disposal systems, septic tanks, dosing chambers, leach fields, and associated subsurface disposal areas.

124.    These systems were used to receive and dispose of wastewater generated by tenant operations, including industrial wastewater, chemical residues, cleaning agents, and other process-related wastes.

125.    Jumbo Capital exercised authority over the continued use of these systems and permitted tenants to discharge wastewater from manufacturing and industrial operations into the Swanson Road Facility's wastewater infrastructure.

126.    At the time of its acquisition in November 2016, Jumbo Capital knew or should have known that the Swanson Road Facility was occupied by industrial tenants engaged in

manufacturing, electronics assembly, and precision instrumentation operations involving chemical use and wastewater generation.

127. Jumbo Capital further knew or should have known that the use of on-site septic systems for disposal of industrial wastewater created a substantial risk of contamination of soil, groundwater, and surface water.

128. Jumbo Capital knew or should have known that PFAS had been widely used in industrial applications for decades, including in coatings, lubricants, cleaning agents, and manufacturing processes of the type conducted at the Swanson Road Facility.

129. Despite these known risks, Jumbo Capital failed to conduct adequate environmental due diligence, failed to investigate the presence of PFAS contamination, and failed to implement appropriate safeguards to prevent ongoing releases.

130. Following its acquisition, Jumbo Capital continued to allow the use of septic systems and subsurface disposal infrastructure for industrial wastewater disposal without implementing treatment, monitoring, or discharge controls.

131. Jumbo Capital's failure to investigate or act in the face of known contamination risks constitutes willful blindness and a conscious disregard of environmental hazards.

132. Jumbo Capital exercised control over tenant operations and the use of the Swanson Road Facility through lease agreements, property management, and oversight of shared infrastructure.

133. Jumbo Capital had the authority to restrict, condition, or prohibit tenant activities involving the use and disposal of hazardous substances, including PFAS-containing materials.

134. Jumbo Capital had the authority to regulate or prohibit the discharge of industrial wastewater into the Swanson Road Facility's septic system and to require appropriate waste handling, treatment, or off-site disposal.

135. Jumbo Capital retained control over the physical systems through which hazardous substances were discharged, including wastewater infrastructure and subsurface disposal areas, and thereby exercised operational control over the disposal of hazardous substances.

136. By permitting, facilitating, and failing to control tenant discharges into these systems, Jumbo Capital actively participated in and contributed to the handling and disposal of hazardous substances at the Swanson Road Facility.

137. PFAS-containing wastes generated by tenant operations—including PFOA-containing products, fluoropolymer materials, cleaning agents, surfactants, and associated residues—were discharged into the septic system and leach fields owned and controlled by Jumbo Capital.

138. These discharges resulted in the release of PFAS, including PFOA and PFOS, to soil, overburden groundwater, and underlying bedrock aquifers.

139. Environmental investigations have confirmed that septic system components at the Swanson Road Facility contain highly elevated PFAS concentrations, demonstrating that these systems functioned as a primary source of PFAS contamination.

140. The magnitude and composition of PFAS detected in septic systems, groundwater, surface water, and water supply wells are consistent with long-term discharge of PFAS-containing wastewater through the Swanson Road Facility's disposal systems.

141. By owning and controlling the infrastructure through which these discharges occurred, Jumbo Capital directly contributed to and facilitated the release and migration of PFAS.

142. PFAS released through the septic system and subsurface disposal areas migrated into groundwater and fractured bedrock aquifers and discharged to wetlands, tributaries, and Beaver Brook. These releases and the threat of releases are ongoing.

143. These hydrologically connected pathways transported PFAS into groundwater recharge areas and Zone II wellhead protection areas serving the Town of Littleton's public drinking water supply.

144. PFAS released through Jumbo Capital's property and infrastructure combined with PFAS released by tenant operations to form a commingled plume of contamination that migrated off-site and contaminated the Littleton drinking water supply.

145. The Swanson Road Facility constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9), from which there has been a "release" of "hazardous substances," including PFOA and PFOS, within the meaning of 42 U.S.C. §§ 9601(14) and 9601(22).

146. Jumbo Capital is liable under CERCLA, 42 U.S.C. § 9607(a), as a current owner of a facility from which hazardous substances were released.

147. Jumbo Capital is further liable as an operator because it exercised control over the Swanson Road Facility's wastewater systems and the disposal of hazardous substances.

148. Jumbo Capital is additionally liable as an arranger to the extent it directed, controlled, or facilitated the disposal of hazardous substances through the Swanson Road Facility's wastewater systems.

149. The releases of PFAS from the Swanson Road Facility were a substantial contributing factor in causing contamination of groundwater and surface water systems, including the Littleton drinking water supply.

150.    The resulting contamination constitutes a single and indivisible harm, for which Jumbo Capital is jointly and severally liable.

151.    Jumbo Capital's conduct constitutes negligence, nuisance, trespass, and failure to warn, in that it owned, controlled, and operated a property and wastewater system through which hazardous substances were released and allowed to migrate off-site, interfering with the use and enjoyment of Littleton's public drinking water resources.

152.    **Defendant INVETECH INC.** ("Invetech") is a corporation organized under the laws of Delaware and registered to do business in Massachusetts. Invetech's resident agent is C T Corporation System, 155 Federal Street, Suite 700, Boston MA 02110.

153.    Invetech, through its Dover Motion division, has owned, operated, and/or controlled industrial and manufacturing operations at 159 Swanson Road, Boxborough, Massachusetts (the "Invetech Facility") from at least 2012 to the present. The Invetech Facility comprises part of the Swanson Road Facility.

154.    Invetech conducts engineering, product development, and manufacturing operations at the Invetech Facility for the diagnostic and life sciences industries. This includes the design and manufacture of custom engineered motion systems and in vitro diagnostic instruments, which involved machine shop activities, precision assembly, and the use of industrial chemicals and process fluids.

155.    Invetech's operations at the Invetech Facility include the use, handling, storage, and disposal of hazardous substances, including PFOA and PFOS, using fluorinated lubricants, surfactants, and other chemical products containing these PFAS and other PFAS.

156.    Invetech's operations at the Invetech Facility have included, inter alia, the design and manufacture of fluid handling systems, microfluidic components, diagnostic cartridges, and

automated laboratory instruments, all of which require materials and components exhibiting high chemical resistance, low surface energy, and thermal stability.

157.    Such properties are commonly achieved using PFAS, including fluoropolymers (e.g., PTFE, FEP, and PFA), fluorinated coatings, and PFAS-containing lubricants and processing aids, which are widely used in medical devices and diagnostics manufacturing.

158.    Upon information and belief, Invetech used, incorporated, handled, and/or processed PFAS-containing materials and components, including those with PFOA and PFOS, at the Invetech Facility in connection with its design, assembly, testing, and manufacture of its products.

159.    Invetech's operations necessarily involved the cleaning, flushing, and testing of fluidic systems and components, as well as the use and disposal of PFAS-containing parts, coatings, and industrial materials, resulting in the generation of PFAS-containing wastes.

160.    Invetech used PFAS-containing products at the Invetech Facility, including fluorinated lubricants such as MagnaLube MG75, TriGel 1200SC, and PTFE, as well as floor treatment products including Zep High Traffic Floor Polish, which contains PFOA.

161.    Invetech used such products in connection with, among other things, machine shop operations, equipment maintenance, cleaning, and facility-wide floor treatment, including application of floor polish approximately one to two times per year at volumes of approximately 100 gallons per year.

162.    At all relevant times, Invetech discharged wastewater and residual chemical materials generated by its operations to Swanson Road Facility's septic system described above.

163.    Floor drains within the Invetech Facility discharged directly to this septic system, creating a direct pathway for industrial fluids, cleaning agents, and other chemical residues to enter the subsurface environment.

164.    Residual chemical wastes generated by Invetech's operations—including degreasing solutions, cleaning agents, and floor polish runoff—were discharged to the septic system, including disposal of residual floor polish and cleaning runoff through sanitary wastewater streams.

165.    These disposal practices resulted in the release of PFAS-containing substances, including PFOA and PFOS, to soil, overburden groundwater, and underlying bedrock aquifers at and from the Invetech Facility.

166.    Environmental investigations have confirmed that PFAS released at the Invetech Facility contaminated septic system contents, groundwater, and water supply wells at concentrations exceeding applicable Massachusetts regulatory standards, including elevated PFAS6 concentrations in septic systems and groundwater monitoring wells.

167.    The chemical composition and relative distribution of PFAS compounds detected in septic system contents, groundwater, and water supply wells correlate, confirming that PFAS released from Invetech Facility operations migrated from septic disposal areas into groundwater and impacted drinking water sources.

168.    Invetech released PFAS, including but not limited to PFOA, PFOS, and/or their precursors, into the environment through multiple pathways, including: (a) discharge to septic systems and leach fields; (b) infiltration into overburden groundwater; (c) migration through fractured bedrock aquifers; (d) discharge to wetlands and surface water tributaries; and (e)

transport through Beaver Brook and hydrologically connected systems into downgradient groundwater and drinking water supplies, particularly those of Littleton.

169. These pathways provided a continuous and foreseeable mechanism for PFAS released from Invetech's operations to migrate off-site and impact downgradient receptors, including the Town of Littleton's drinking water supply.

170. Invetech knew or should have known that PFAS-containing materials used in its operations were persistent, mobile, and resistant to degradation, and that disposal of such materials through septic systems and subsurface pathways would result in environmental contamination and migration to groundwater and surface water.

171. Despite such knowledge, Invetech failed to adequately contain, treat, or prevent the release and migration of PFAS from the Invetech Facility and failed to warn downstream water users of the risks posed by such contamination.

172. The Invetech Facility constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9), from which there has been a "release" of "hazardous substances," including PFOA and PFOS, within the meaning of 42 U.S.C. §§ 9601(14) and 9601(22).

173. Invetech is liable under CERCLA, 42 U.S.C. § 9607(a), as a current and/or former operator of a facility from which hazardous substances were released and as an arranger for disposal of hazardous substances through its handling and discharge of PFAS-containing materials at the Facility.

174. The releases of PFAS from Invetech's operations were a substantial contributing factor in causing contamination of groundwater and surface water systems, including the Littleton drinking water supply, and have resulted in the incurrence of response costs and damages.

175.    Invetech's conduct constitutes negligence, nuisance, trespass, and failure to warn, in that Invetech unreasonably released hazardous substances that foreseeably migrated off-site and interfered with the use and enjoyment of public drinking water resources.

176.    **Defendant SETRA SYSTEMS LLC** ("Setra") is a limited liability company organized under the laws of the Commonwealth of Massachusetts. Setra's resident agent is C T Corporation System, 155 Federal Street, Suite 700, Boston MA 02110. On information and belief, on December 31, 2024, Setra was converted into a limited liability company and was formerly a corporation named Setra Systems, Inc.

177.    Setra has operated and/or controlled a facility 159 Swanson Road in Boxborough, Massachusetts (the "Setra Facility") from at least 1996 to the present. The Setra Facility comprises part of the Swanson Road Facility.

178.    Setra is an industrial electronics manufacturer. Setra manufactures precision pressure sensors, environmental monitors, and related instrumentation at the Setra Facility. These operations involve electronics assembly, calibration and testing processes, and the use of specialty fluids, coatings, sealants, and cleaning agents—categories historically associated with PFAS-containing materials due to their chemical stability, non-reactivity, and surface-active properties.

179.    These operations include machine shop activities, component fabrication, electronics assembly, and product finishing processes requiring the use of chemical products, coatings, adhesives, lubricants, surfactants, and cleaning agents.

180.    Setra used and handled PFAS-containing materials at the Facility, including fluoropolymer-containing products and PFOA-containing formulations.

181. Setra used products containing polytetrafluoroethylene ("PTFE"), including Loctite 565 Thread Sealant and MS-122AD mold release, both of which incorporate fluorinated polymer chemistries within this PFAS class.

182. Setra also used Zep High Traffic Floor Polish, which contains PFOA, a regulated PFAS compound.

183. Setra applied such floor polish throughout the Facility on a recurring basis, including usage of approximately 100 gallons per year over decades of operation.

184. Setra further used additional products containing PFAS, including PFOA and PFOS and their precursors, including mold release agents, polymer coatings, surfactants, sealants, adhesives, and cleaning formulations associated with precision manufacturing and electronics-related processes.

185. At all relevant times, Setra discharged wastewater and residual chemical materials generated by its operations to on-site wastewater systems, including the Swanson Road Facility's septic system.

186. Floor drains within the Setra Facility discharged directly to the Swanson Road Facility's septic system, providing a direct pathway for chemical residues and industrial fluids to enter the subsurface environment.

187. Setra disposed of residual cleaning agents, surfactants, and floor polish runoff through sanitary wastewater streams that discharged to the septic system.

188. Setra also discharged certain cleaning products and associated residues directly to the ground surface during facility maintenance and outdoor cleaning activities.

189.    Setra conducted additional process-related activities, including acid-based etching and cleaning, in which chemical wastes were neutralized and subsequently disposed of through sanitary systems connected to the on-site septic system.

190.    Setra utilized aqueous parts washers and cleaning systems that generated wastewater streams, portions of which were managed on-site and contributed to waste handling pathways associated with the Swanson Road Facility's wastewater infrastructure.

191.    These practices resulted in the discharge and release of PFAS-containing substances, including PFOA and PFOS, to soil, septic system components, overburden groundwater, and underlying bedrock aquifers.

192.    Environmental investigations have confirmed the presence of PFAS, including PFOA and PFOS, in the septic system, groundwater, surface water, and water supply wells at and downgradient of the Setra Facility, including PFAS concentrations in septic system components at levels orders of magnitude above regulatory standards.

193.    The magnitude and composition of PFAS, including PFOA and PFOS, detected in septic system contents, groundwater, and water supply wells are consistent with long-term discharge of PFAS-containing materials through wastewater and septic pathways associated with Facility operations.

194.    PFAS, including PFOA and PFOS, released from Setra's operations migrated through multiple environmental pathways, including: discharge to septic systems and leach fields; infiltration into overburden groundwater; transport through fractured bedrock aquifers; discharge to wetlands and tributary surface waters; and transport through Beaver Brook and hydrologically connected systems towards Littleton's downgradient groundwater and drinking water supplies, including the Beaver Brook Wells.

195.    These pathways provided a continuous and foreseeable mechanism for PFAS released from Setra's operations to migrate off-site and impact downgradient receptors.

196.    Setra knew or should have known that PFAS-containing materials, including PFOA-containing products and fluoropolymer-based materials, are persistent, mobile, and resistant to degradation, and that disposal of such materials through septic systems and subsurface pathways would result in environmental contamination and migration.

197.    Setra further knew or should have known that wastewater disposal through floor drains and septic systems would transport dissolved contaminants into groundwater and surface water systems.

198.    Despite such knowledge, Setra failed to adequately contain, treat, or prevent the release and migration of PFAS, including PFOA and PFOS, from the Setra Facility and failed to warn downstream water users of the risks posed by such contamination.

199.    The Setra Facility constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9), from which there has been a "release" of "hazardous substances," including PFOA and PFOS, within the meaning of 42 U.S.C. §§ 9601(14) and 9601(22).

200.    Setra is liable under CERCLA, 42 U.S.C. § 9607(a), as a current and/or former owner and operator of a facility from which hazardous substances were released and as an arranger for disposal of hazardous substances through its handling and discharge of PFAS-containing materials.

201.    The releases of PFAS from Setra's operations were a substantial contributing factor in causing contamination of Littleton's drinking water supply, and have resulted in the incurrence of response costs and damages.

202.    Setra's conduct constitutes negligence, nuisance, trespass, and failure to warn, in that Setra unreasonably used, handled, and disposed of hazardous substances in a manner that foreseeably resulted in off-site migration and contamination of public drinking water resources.

203.    **Defendant SYNQOR, INC.** ("SynQor") is a corporation organized under the laws of Delaware and registered to do business in Massachusetts. It may be served through its registered agent, The Corporation Trust Company, 1209 North Orange Street, Wilmington DE 19801.

204.    SynQor operated an electronics manufacturing and assembly facility at 155 Swanson Road in Boxborough, Massachusetts (the "SynQor Facility") from at least April 25, 2003 to the present. The SynQor Facility comprises part of the Swanson Road Facility.

205.    SynQor designs, assembles, and tests power conversion products at the SynQor Facility, including printed circuit board assembly using surface-mount and through-hole processes, mechanical assembly, and system-level integration of electronic components. SynQor's products are designed for harsh environments such as the aerospace industry, for which the application of PFAS is ideal.

206.    These operations involved the use of PFAS and industrial chemicals, including thermal interface compounds, cleaning agents, solvents, and related substances used in circuit board fabrication, assembly, and post-processing. For example, printed circuit boards commonly incorporate PTFE as a processing aid. Other PFAS uses include as a surfactant, including wetting agents, to improve coating uniformity and to control surface tension. These PFAS and related chemicals enter rinse water and process wastewater.

207.    SynQor used thermally conductive compounds in its manufacturing processes, including Parker Chomerics THERM-A-GAP materials, which are high-performance interface materials used in electronics to dissipate heat and maintain reliability under demanding conditions.

40

208.    Such thermal interface materials and electronics manufacturing processes are known to incorporate or be manufactured with fluorinated chemistries, including PFAS and PFAS precursors, or to generate PFAS-containing residues during use, degradation, or disposal.

209.    SynQor's operations also included the cleaning of PCB assemblies using aqueous cleaning systems and associated chemical formulations designed to remove flux residues and other contaminants from electronic components.

210.    Electronics cleaning processes of this type historically and presently utilize surfactants, wetting agents, and specialty formulations that include or are derived from PFAS chemistries, and generate liquid waste streams containing dissolved contaminants.

211.    SynQor also used Zep High Traffic Floor Polish, which contains PFOA, a regulated PFAS compound.

212.    SynQor applied such floor polish throughout the Facility on a recurring basis, including usage of approximately 100 gallons per year over decades of operation.

213.    SynQor generated liquid waste streams from its manufacturing and cleaning operations, including cleaning solutions and process residues, which were managed on-site, including through evaporation systems and other waste handling practices.

214.    Such waste management practices resulted in the concentration, release, and/or discharge of chemical constituents from these waste streams into the environment, including through air emissions, residual waste disposal, and interactions with on-site wastewater systems.

215.    At all relevant times, wastewater and residual materials generated at the SynQor Facility were discharged, directly or indirectly, to on-site wastewater infrastructure, including the Swanson Road Facility's septic system, which released contaminants into the subsurface environment.

216. These disposal practices resulted in the release of hazardous substances, including PFOA and PFOS, to soil, overburden groundwater, and underlying bedrock aquifers at and from the Facility.

217. Environmental investigations have confirmed that PFAS, including PFOA and PFOS, are present in groundwater, septic system components, and water supply wells at and downgradient of the SynQor Facility at concentrations exceeding applicable Massachusetts regulatory standards.

218. PFAS contamination has also been detected in surface water and wetland areas hydraulically connected to the SynQor Facility, confirming migration of contaminants through both groundwater and surface-water pathways.

219. PFAS, including PFOA and PFOS, released from the Synqor Facility migrated through multiple environmental pathways, including: (a) infiltration into overburden groundwater; (b) transport through fractured bedrock aquifers; (c) discharge to wetlands and tributary surface waters; and (d) migration through Beaver Brook and hydrologically connected systems towards Littleton's drinking water supply, where it entered the Beaver Brook Wells.

220. These pathways provided a continuous and foreseeable mechanism for PFAS, including PFOA and PFOS, released from SynQor's operations to migrate off-site and impact downgradient receptors, including Littleton's public drinking water supply.

221. SynQor knew or should have known that the materials and processes used in its operations—including thermal interface compounds and electronics cleaning systems—were associated with persistent and mobile contaminants, including PFAS, and that disposal of such materials through on-site waste management systems would result in environmental releases and migration.

222.    Despite such knowledge, SynQor failed to adequately contain, treat, or prevent the release and migration of PFAS from the Facility and failed to warn downstream water users of the risks posed by such contamination.

223.    The SynQor Facility constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9), from which there has been a "release" of "hazardous substances," including PFOA and PFOS, within the meaning of 42 U.S.C. §§ 9601(14) and 9601(22).

224.    SynQor is liable under CERCLA, 42 U.S.C. § 9607(a), as a current and/or former operator of a facility from which hazardous substances were released and as an arranger for disposal of hazardous substances through its handling and management of PFAS-containing materials and waste streams.

225.    The releases of PFAS from SynQor's operations were a substantial contributing factor in causing contamination of groundwater and surface water systems, including the Littleton drinking water supply, and have resulted in the incurrence of response costs and damages.

226.    SynQor's conduct further constitutes negligence, nuisance, trespass, and failure to warn.

227.    Although SynQor has asserted in regulatory filings that it is not aware of any use, storage, or release of PFAS at the SynQor Facility, SynQor's own disclosures confirm that it conducted circuit board assembly operations using thermal interface compounds and chemical cleaning systems and generated associated liquid waste streams managed on-site. These materials and processes are known to incorporate or generate PFAS and to produce PFAS-containing residues. Moreover, environmental investigations have confirmed the presence of PFAS in groundwater, surface water, and water supply wells at and downgradient of the Facility. The presence, distribution, and migration of PFAS in environmental media are consistent with releases

43

from on-site industrial operations, including those conducted by SynQor, notwithstanding its claimed lack of knowledge.

**B. 149 Ayer Road, Littleton, Massachusetts**

228.    **Defendant AMRIZE NORTHEAST INC.** ("Amrize") is a corporation organized under the laws of the Commonwealth of Massachusetts. Amrize's registered agent is C T Corporation System, 155 Federal Street, Suite 700, Boston MA 02110. Amrize was known as "Holcim – NER, Inc." from May 1, 2022 to June 20, 2025. Previously, Amrize was known as "Aggregate Industries – Northeast Region, Inc." from June 1, 2001 to May 1, 2022.

229.    Amrize, formerly known as Aggregate Industries – Northeast Region, Inc. ("Aggregate Industries") was a subsidiary within the corporate family of Holcim Ltd. ("Holcim"), a global building materials company, from approximately 2005 until 2025.

230.    Upon information and belief, in June 2025, Holcim completed a spin-off of its North American business into a newly formed publicly traded company, Amrize, which assumed the assets, operations, and liabilities of Holcim's United States and Canadian subsidiaries, including Aggregate Industries' regional operating entities. As a result, Amrize and its affiliated entities, including Amrize Northeast, Inc., are successors to and continuation of Holcim's North American operations and liabilities, including those arising from the release of hazardous substances as discussed below.

231.    Upon information and belief, Amrize is the largest asphalt and concrete supply company in New England.

232.    At all relevant times, Amrize, including under its several previous names, owned and operated, and continues to own and operate, a large-scale quarry and aggregate processing facility at 149 Ayer Road in Littleton, Massachusetts, where it extracts, crushes, stores, and

distributes stone, sand, and recycled construction materials, including recycled asphalt pavement ("RAP"), for use in regional construction (the "Aggregate Facility").

233. The Aggregate Facility has been used for quarrying, mixing cement, and related industrial operations since at least the mid-20th century and presently encompasses extensive excavation, crushing, washing, stockpiling, and material-handling operations associated with asphalt and concrete production.

234. Upon information and belief, Amrize, then known as Aggregate Industries, acquired the Aggregate Facility in our around 1991. The Aggregate Facility encompasses approximately 190 acres.

235. The Aggregate Facility is located within the Spectacle Pond/Bennett's Brook watershed and directly overlies hydraulically connected groundwater that supplies, and is induced by Littleton's Spectacle Pond groundwater well.

236. Amrize's operations utilize groundwater and surface water and requires continuous large-scale dewatering. Amrize withdraws approximately one million gallons per day from the quarry and discharges that water to Quarry Stream, which flows directly into Spectacle Pond.

237. These withdrawals and discharges materially alter local hydrogeology by lowering groundwater elevations, inducing recharge from Spectacle Pond into the aquifer, and recirculating surface water and groundwater between the quarry, the stream, the pond, and the municipal well.

238. As a result, groundwater and surface water at and downgradient of the Aggregate Facility are intimately and continuously exchanged with Spectacle Pond and Littleton's groundwater well, creating a direct hydraulic pathway for contaminants released at the Aggregate Facility to enter Littleton's drinking water supply.

239.    Amrize has admitted, in response to MassDEP inquiries, that it used polytetrafluoroethylene ("PTFE") lubricants and related materials at the Aggregate Facility.

240.    As discussed above, PTFE is a fluoropolymer and a member of the class of PFAS, and its processing, use, and degradation are associated with releases of PFOA, PFOS, and related PFAS compounds.

241.    Amrize's operations—including quarrying, stone washing, asphalt and concrete material handling, and equipment maintenance—are industrial processes in which PFAS-containing lubricants, coatings, release agents, and treated materials are commonly used and discharged to the environment.

242.    Amrize uses cement slurries and process water in a way that, when combined with PFAS-contaminated inputs (e.g., leachate, industrial water, or recycled sludge), created PFAS-bearing cement wastes and stormwater at its facilities, and that such practices were reasonably likely to reach soil and groundwater.

243.    Amrize's broader asphalt and construction-materials operations include the handling and use of recycled asphalt pavement ("RAP") and other recycled aggregates, which are recognized PFAS sources when using PFAS-impacted pavements and materials.

244.    RAP is a recognized PFAS source and vector because it is produced by milling and reprocessing legacy road surfaces that historically incorporated PFAS-containing materials, including surface treatments, sealants, and traffic-marking coatings, as well as receiving PFAS inputs from roadway runoff, vehicle fluids, and atmospheric deposition over time. The milling, crushing, stockpiling, and reuse of RAP mobilize these concentrated and accumulated PFAS, allowing them to leach into stormwater and infiltrate soil and groundwater, or to be discharged through process water and runoff. Accordingly, facilities like the Aggregate Facility that handle,

46

store, process, or incorporate RAP into new asphalt mixes introduce and release PFAS to the surrounding environment even where PFAS are not intentionally added to current formulations.

245. On information and belief, Amrize has handled, used, and discharged PFAS-containing or PFAS-bearing materials at the Aggregate Facility, including fluoropolymer-based lubricants, coatings, admixtures, and PFAS-impacted recycled materials, resulting in the introduction of PFAS, including PFOA and PFOS, into site soils, groundwater, and surface water.

246. In fact, PFAS have been detected in both groundwater and surface water at the Aggregate Facility at concentrations demonstrating the presence of a release of hazardous substances within the meaning of CERCLA. In September 2020, Amrize notified MassDEP that PFAS had been detected in surface water at the Aggregate Facility.

247. Sampling conducted in 2020 documented PFAS, including PFOA, PFOS, PFHxS, PFNA, and PFHpA, in surface water at the Aggregate Facility, as well as in on-site groundwater monitoring wells. The surface water sampling at the Aggregate Facility showed PFOS at 9.74 ppt and PFOA at 10.5 ppt. Groundwater sampling at the facility showed PFOA at 43.3 ppt.

248. This sampling confirmed the presence of PFAS, including PFOA and PFOS, at both surface water and groundwater at the Aggregate Facility.

249. PFAS have also been detected in Quarry Stream downstream of the Aggregate Facility, in Spectacle Pond, and in Littleton's nearby groundwater well, with overlapping compound profiles—including PFOA and PFOS—linking on-site contamination to downgradient receptors.

250. The presence of PFAS in on-site groundwater and surface water, combined with detections in downgradient surface water and Littleton's well, demonstrates that PFAS, including

PFOA and PFOS, released at the Aggregate Facility have migrated off-site through hydrologically connected pathways.

251. Amrize's quarry dewatering system extracts PFAS-impacted groundwater and quarry water and discharges that water directly to Quarry Stream, which flows into Spectacle Pond.

252. This discharge constitutes a continuous and substantial point and non-point source release of PFAS-contaminated water to the Spectacle Pond watershed.

253. The hydrologic system in this area is characterized by strong surface water–groundwater interaction, such that water discharged from the quarry mixes with pond water and is subsequently drawn into the aquifer by the induced-recharge effects of Littleton's groundwater well.

254. Amrize's pumping regime further enhances contaminant migration by drawing water from Spectacle Pond into the aquifer and recirculating it through the quarry system, thereby mobilizing and redistributing PFAS between groundwater and surface water.

255. On information and belief, PFAS released at the Aggregate Facility have been transported via (a) quarry dewatering discharge to Quarry Stream, (b) downstream flow into Spectacle Pond, and (c) induced recharge into the aquifer captured by Littleont's production well.

256. These pathways are foreseeable, direct, and well-understood consequences of Amrize's large-scale dewatering and discharge operations in a hydraulically connected pond-aquifer system.

257. By at least 2020, Amrize had actual knowledge that PFAS were present in groundwater and surface water at the Aggregate Facility.

258. The MassDEP directed Amrize to install treatment to eliminate PFAS discharges to surface water, specifically identifying the quarry discharge as a source requiring control.

259. Despite this directive, Amrize failed to timely implement effective treatment or fully characterize PFAS concentrations and loading in its dewatering discharge.

260. Amrize's continued withdrawal and discharge of large volumes of PFAS-impacted water, without adequate treatment or control, resulted in ongoing or historical releases of PFAS to Quarry Stream, Spectacle Pond, and the connected groundwater system supplying Littleton's drinking water.

261. Amrize's Aggregate Facility has a documented history of unlawful discharges of industrial stormwater and process water in violation of the Clean Water Act.

262. In a 2006 federal enforcement action, Amrize entered into a consent decree with the United States Department of Justice ("DOJ") (on behalf of EPA) resolving Clean Water Act violations involving unauthorized discharges, particularly stormwater, and failures to comply with permit requirements at the Aggregate Facility. Amrize agreed to pay a $2.75 million civil penalty to resolve the violations at the Aggregate Facility and others.

263. DOJ and EPA specifically identified quarry dewatering, material stockpiles, and industrial operations at facilities like Littleton as sources of pollutant discharges requiring monitoring and control.

264. These violations placed Amrize on notice that its Littleton operations discharged pollutants through precisely the pathways—stormwater runoff, process water, and dewatering discharge—through which PFAS are now known to migrate.

265. Notwithstanding this notice, Amrize failed to identify, monitor, or control PFAS in those discharge pathways, resulting in releases of hazardous substances to the environment.

266. Furthermore, in 2007 Amrize pleaded guilty to federal criminal charges involving the concealment and falsification of material information provided to government entities. The

conduct related to the supply of concrete for Boston's "Big Dig" – the Central Artery/Tunnel Project. In the plea, Amrize agreed to pay $50 million to resolve criminal and civil liabilities.

267.    That admitted conduct demonstrates Amrize's knowledge of regulatory compliance obligations and its capacity and willingness to manipulate technical records and reporting when noncompliance would otherwise be detected.

268.    While unrelated to PFAS, this conduct is probative of the unreliability of Amrize's self-reported environmental data and disclosures, including those concerning discharges, materials handling, and regulatory compliance at the Aggregate Facility.

269.    Consistent with that course of conduct, and on information and belief, Amrize failed to fully and accurately disclose its handling and release of PFAS and failed to implement adequate controls on its dewatering and stormwater discharges, resulting in unreported and uncontrolled releases of PFAS to the Spectacle Pond watershed.

270.    The Aggregate Facility is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

271.    Amrize is a "person" and an owner and operator of that facility within the meaning of 42 U.S.C. § 9607(a).

272.    PFAS, including PFOA and PFOS, are hazardous substances within the meaning of CERCLA.

273.    Amrize has caused or contributed to the release and threatened release of PFAS, including PFOA and PFOS, from the Aggregate Facility into the environment, including groundwater, surface water, Quarry Stream, and Spectacle Pond.

274. Those releases have migrated to and contaminated Littleton's drinking water supply, causing the incurrence of response costs that are necessary and consistent with the National Contingency Plan.

275. Amrize's conduct further constitutes negligence, nuisance, trespass, and failure to warn, in that Amrize knowingly and foreseeably released PFAS into a hydrologically connected system supplying municipal drinking water and failed to prevent, control, or remediate those releases.

## C. 151 – 153 Taylor Street, Littleton, Massachusetts

276. From at least the late 1990s through December 2019, Compaq Computer Corporation and its successors owned and operated the Compaq/HP Facility at 151–153 Taylor Street in Littleton, Massachusetts (the "Compaq/HP Facility").

277. Compaq Computer Corporation ("Compaq") was a corporation organized under the laws of the State of Delaware, with its principal place of business in Harris County, Texas.

278. Hewlett-Packard Company ("Hewlett-Packard") was a corporation organized under the laws of the State of Delaware, with its principal place of business at 1501 Page Mill Road, Palo Alto, California 94304.

279. **Defendant HP INC.** is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1501 Page Mill Road, Palo Alto, California 94304. HP Inc. may be served through its registered agent, The Corporation Trust Company, 1209 North Orange Street, Wilmington DE 19801.

280. **Defendant HEWLETT PACKARD ENTERPRISE COMPANY** ("HPE") is a corporation organized under the laws of the State of Delaware, with its principal place of business

at 1701 East Mossy Oaks Road, Spring, Texas 77389. HPE may be served through its registered agent, The Corporation Trust Company, 1209 North Orange Street, Wilmington DE 19801.

281.    Compaq Computer Corporation, Hewlett-Packard Company, HP Inc., and Hewlett Packard Enterprise Company are referred to collectively herein as the "HP Defendants."

282.    Upon information and belief, the HP Defendants went through a series of corporate mergers and a spin-off. First, in May 2002, Hewlett-Packard Company acquired all of Compaq in a stock merger. As such, Hewlett-Packard Company is the successor in interest to Compaq and assumed Compaq's assets, liabilities, and legal obligations, including liabilities arising from Compaq's ownership and operation of the Compaq/HP Facility described herein. Second, Hewlett-Packard owned and/or operated the Compaq/HP Facility from May 2002 through November 2015. In November 2015, Hewlett-Packard Company split into two independent entities: HP Inc. and Hewlett Packard Enterprise Company. HP Inc. assumed a share of Hewlett-Packard's assets, liabilities, and legal obligations arising from Hewlett-Packard's prior operations, including operations at the Compaq/HP Facility.

283.    At all times relevant hereto, the HP Defendants owned and/or operated a high-technology engineering, research, development, testing, and product-validation facility located at 151–153 Taylor Street (the "Compaq/HP Facility"). The Compaq/HP Facility was an industrial building of approximately 200,000 square feet, built in 1987, situated on property zoned for industrial use in the Taylor Street technology corridor of Littleton.

284.    The Compaq/HP Facility was located within a designated Aquifer and Water Resource Protection District, near groundwater resources that supply drinking water to Littleton, including municipal wells that draw from the local aquifer system. The HP Defendants knew or should have known that its operations were conducted in a hydrogeologically sensitive area where

contaminants released to soil, groundwater, or surface water could migrate and impact public drinking water supplies. Publicly available municipal and MassDEP mapping identifies the Facility as being located within the approved Zone II recharge area for Littleton's municipal drinking-water wells.

285.    The Compaq/HP Facility is located squarely within the MassDEP-approved Zone II wellhead protection area for Littleton's Whitcomb Avenue Wells and Beaver Brook Wellfield (the "Whitcomb/Beaver Brook Wells"). Zone II areas constitute the primary recharge areas contributing groundwater to public water-supply wells. Groundwater and contaminants released within those recharge areas are captured by and migrate toward the Whitcomb/Beaver Brook Wells. PFAS-containing substances released from the Compaq/HP Facility into soil, groundwater, stormwater systems, wastewater systems, or the subsurface environment were therefore released directly within the recharge area and capture zone of Littleton's drinking water supply and were subject to migration toward and into the Whitcomb/Beaver Brook Wells. Groundwater recharge occurring beneath the Compaq/HP Facility contributes directly to the aquifer captured by the Whitcomb/Beaver Brook Wells. Releases occurring within that capture zone were therefore foreseeably transported toward municipal drinking water wells used by Littleton.

286.    Environmental investigations have identified PFOA and PFOS contamination, and other PFAS compounds, within the groundwater and wellhead protection area downgradient of the Compaq/HP Facility at concentrations exceeding applicable regulatory standards. The location of those detections, together with this facility's operations and hydrogeologic setting, supports the conclusion that releases from the Compaq/HP Facility migrated toward Littleton's municipal drinking-water supply.

287.    The HP Defendants operated the Compaq/HP Facility from at least 1998 through December 20, 2019, following the series of corporate mergers described above, at which time the Compaq/HP Facility was vacated. Upon information and belief, the Compaq/HP Facility was subsequently demolished.

288.    The Compaq/HP Facility served as a high-technology engineering, research, development, testing, and product-validation campus supporting enterprise-computing, networking, communications, storage, and related electronic hardware systems. The Facility was previously operated by Digital Equipment Corporation and thereafter by Compaq Computer Corporation and Hewlett-Packard Company and its successors. Activities conducted at the Facility included electronics engineering, prototype development, hardware testing, systems integration, product qualification, wireless and communications-device validation, electronics assembly, and associated laboratory and technical operations.

289.    Hewlett-Packard's own patent disclosures further evidence its use and development of fluoropolymer technologies relevant to electronic-product manufacturing and device-housing applications. U.S. Patent No. 6,591,583 identifies fluoropolymers including PTFE, PVDF, FEP, and PFA for use in computer-equipment, server-system, and disk-drive enclosure technologies. U.S. Patent Application Publication No. 2017/0313041 identifies PTFE and expanded PTFE fluoropolymers as components of composite housings for electronic devices. U.S. Patent No. 11,920,244 likewise concerns layered coating and surface-treatment technologies for electronic-device housings. These disclosures demonstrate Hewlett-Packard's familiarity with fluoropolymer materials (i.e., PFAS) and manufacturing processes and render it more than plausible that fluoropolymer-containing materials were used, handled, stored, tested, and disposed of at the Compaq/HP Facility.

290.    During operation of the Compaq/HP Facility, the HP Defendants used, handled, stored, and disposed of industrial materials commonly utilized in electronics engineering, testing, assembly, and manufacturing operations, including fluoropolymer-containing wiring, cables, printed circuit board materials, coatings, lubricants, cleaning agents, and maintenance chemicals. Upon information and belief, such materials included PFAS-containing substances, including fluoropolymer-containing materials and other PFAS-containing substances, including materials manufactured using PFOA, PFOS, or related PFAS compounds.

291.    The HP Defendants maintained and operated infrastructure at the Compaq/HP Facility that created foreseeable pathways for releases of PFAS and other hazardous substances, including industrial operations involving fluorinated materials, floor-drain and wastewater discharges, stormwater systems, and spills or leaks associated with hazardous-material handling. Upon information and belief, the Compaq/HP Facility included floor drains, sanitary and industrial wastewater infrastructure, stormwater conveyance systems, utility corridors, and hazardous-material handling areas that created foreseeable pathways for releases of PFAS and other hazardous substances.

292.    Upon information and belief, PFAS releases, including PFOA and PFOS, attributable to the Compaq/HP Facility include one or more of the following pathways:

    a.  Industrial Wastewater and Stormwater: PFAS-containing residues from electronics assembly, parts washing, equipment maintenance, surface preparation, and handling of PTFE-containing components entered wastewater and/or stormwater via floor drains, washdown, outdoor storage areas, loading docks, or waste container leakage, ultimately migrating to soil, groundwater, and surface waters at and surrounding the Site.

b. Solid Waste and Off-Site Disposal: Scrap materials, spent PTFE-coated components and assemblies, contaminated wipes and rags, sludges, filters, and spent maintenance consumables generated at the Compaq/HP Facility carried PFAS and were disposed of on- or off-site. Such wastes present recognized pathways for PFAS releases through landfilling or thermal treatment, with subsequent environmental transport and deposition.

c. Electronics Testing and Component Handling: Electronics engineering, prototype development, product qualification, hardware testing, and related laboratory operations involved the use and handling of fluoropolymer-containing cables, wiring insulation, connectors, coatings, lubricants, gaskets, membranes, thermal-management materials, and other PFAS-containing components. Through routine use, maintenance, testing, cleaning, replacement, and disposal of such materials, PFAS-containing residues and wastes were released to facility wastewater systems, solid-waste streams, soil, and groundwater.

293.    As computer hardware design, testing, and assembly operations at the Compaq/HP Facility, the HP Defendants knew or should have known that PFAS-associated materials — including PTFE-containing components, fluoropolymer coatings, and associated processing aids and byproducts — generate persistent PFAS residues and wastes that migrate in the environment and contaminate water resources.

294.    The HP Defendants' engineering, testing, assembly, maintenance, and related industrial activities at the Compaq/HP Facility involved the use, handling, storage, and disposal of PFAS-containing materials and resulted in releases and threatened releases of PFAS, including

PFOA and PFOS, to the environment. Those releases migrated through soil and groundwater and contributed to PFAS contamination detected within Littleton's drinking-water supply.

295.    As former owners and/or operators of the Compaq/HP Facility during the period in which hazardous substances were disposed of thereon, Compaq Computer Corporation and Hewlett-Packard Company are each a "covered person" within the meaning of CERCLA § 107(a), 42 U.S.C. § 9607(a)(1) and (a)(2), and are jointly and severally liable for all response costs incurred and to be incurred in connection with the release and threatened release of hazardous substances at the Site. As successor in interest to Compaq Computer Corporation, Hewlett-Packard Company bears full CERCLA liability for Compaq's acts and omissions at the Compaq/HP Facility in addition to its own independent liability as a former owner and operator. As successors in interest to Hewlett-Packard Company following the 2015 corporate division, HP Inc. and Hewlett Packard Enterprise Company each bear CERCLA liability for the acts and omissions of their predecessor at the Compaq/HP Facility. Upon information and belief, Hewlett Packard Enterprise Company, as the successor entity retaining HP's enterprise computing and commercial technology business lines most closely associated with the Compaq/HP Facility operations, bears primary successor liability for the CERCLA liabilities arising from those operations, without prejudice to Littleton's claims against HP Inc. as an additional successor in interest. Each of the HP Defendants is jointly and severally liable for all response costs incurred and to be incurred in connection with the Site.

296.    The HP Defendants owed a duty to exercise reasonable care in the use, storage, handling, and disposal of hazardous substances, including PFAS, PFOA, and PFOS, so as to prevent releases that could contaminate groundwater and drinking water supplies.

297.    The HP Defendants breached that duty by, among other things: (i) Failing to properly manage, contain, and dispose of PFAS-containing materials; (ii) Failing to implement

adequate safeguards to prevent releases to soil and groundwater; (iii) Failing to monitor for and detect contamination; and (iv) Continuing operations involving hazardous substances in a known aquifer protection area without adequate controls.

298.    The HP Defendants knew or should have known that its conduct created a foreseeable risk of contamination of public drinking water supplies.

299.    As a direct and proximate result of the HP Defendants' negligence, PFAS, including PFOA and PFOS, were released into the environment and migrated to Littleton's drinking water sources, causing injury and damages.

300.    The HP Defendants' release of PFAS, including PFOA and PFOS, into the environment unreasonably interfered with Littleton's use and enjoyment of its property, including its drinking water supply system.

301.    The contamination of groundwater with PFAS, including PFOA and PFOS, has impaired the quality, safety, and usability of Littleton's water supply, requiring costly treatment and ongoing monitoring.

302.    The HP Defendants' conduct constitutes a public nuisance in that it has interfered with public health, safety, and the environment.

303.    The HP Defendants knew or should have known that PFAS used or present at its facility posed a risk of environmental contamination and harm to human health.

304.    Despite this knowledge, the HP Defendants failed to: (i) Warn Littleton or the public of the risks associated with PFAS; (ii) Disclose the presence and use of PFAS at the facility; (iii) Take appropriate steps to prevent exposure; or (iv) Remediate contamination in a timely manner.

305.    The HP Defendants' failure to warn deprived Littleton of the opportunity to take earlier action to protect its water supply and mitigate damages.

306.    The HP Defendants released PFAS, including PFOA and PFOS, from the Compaq/HP Facility. The Facility is located within the recharge area and groundwater capture zone of the Whitcomb/Beaver Brook Wells. PFAS contamination has been detected within the affected aquifer system and municipal water supply. These facts plausibly support the inference that releases from the Compaq/HP Facility contributed to PFAS contamination for which Littleton has incurred and continues to incur response costs. The HP Defendants' releases of PFAS were a substantial factor in causing the contamination of Littleton's drinking water supply. At the pleading stage, Littleton need not quantify the precise contribution of each Defendant; it is sufficient that the HP Defendants released PFAS, including PFOA and PFOS, that such substances are present in Littleton's water supply, and that the hydrogeologic conditions support migration from the Compaq/HP Facility to Littleton's wells.

Ownership of the Compaq/HP Facility

307.    **Defendant NORTHBRIDGE PARTNERS LLC** ("NorthBridge") is a Massachusetts limited liability company with its principal office at 401 Edgewater Place, Wakefield, Massachusetts. Its resident agent is Dean Atkin, 401 Edgewater Place, Suite 430, Wakefield MA 01880. NorthBridge serves as the manager of multiple affiliated entities that have owned, controlled, developed, managed, and/or operated the Compaq/HP Facility.

308.    **Defendant NBPII LITTLETON LLC** ("NBPII") is a Delaware limited liability company, organized in April 2019. Its principal office is 401 Edgewater Place, c/o NorthBridge Partners LLC, Wakefield, Massachusetts. Its resident agent is Corporation Service Company, 251

Little Falls Drive, Wilmington DE 19808. NBPII withdrew its registration in Massachusetts on September 15, 2023.

309.    Public land records reflect that NBPII acquired title to the Compaq/HP Facility in May 2019 and thereafter redeveloped the Compaq/HP Facility, entered into a Host Community Agreement with the Town of Littleton in or around January 2021, and constructed the warehouse development presently located there.[2] NBPII acted through NorthBridge as its manager.

310.    **Defendant LML LITTLETON, LLC** ("LML") is a Delaware limited liability company registered to transact business in Massachusetts, organized in November 2020. Its principal office is 401 Edgewater Place, c/o NorthBridge Partners LLC, Wakefield, Massachusetts. Its resident agent is Corporation Service Company, 251 Little Falls Drive, Wilmington DE 19808.

311.    Public land records further reflect that NBPII conveyed the Compaq/HP Facility to LML by Quitclaim Deed recorded on August 11, 2021 in Book 78449, Page 41 of the Middlesex South Registry of Deeds for stated consideration of approximately $62.7 million. The Town of Littleton assessor's records presently identify LML as owner of the Property. LML is managed by NorthBridge, and the same NorthBridge principals authorized to act on behalf of NBPII are likewise authorized to act on behalf of LML with respect to real-property matters.

312.    NorthBridge, NBPII Littleton LLC, and LML Littleton LLC are referred to, collectively, as the "NorthBridge Defendants."

313.    Publicly available land records reflect that NBPII Littleton LLC acquired the Compaq/HP Facility in 2019 and conveyed the Compaq/HP Facility to LML Littleton LLC by deed recorded on August 11, 2021. The Town of Littleton's assessor records identify LML

---

[2] In April 2025, a MassDEP Notice of Intent form, submitted pursuant to the Massachusetts Wetlands Protection Act M.G.L. c. 131, §40 identified NBPII Littleton LLC as the owner of the Compaq/HP Facility.

Littleton LLC as the current owner of the Property. Nevertheless, subsequent permitting documents submitted in connection with the Property continued to identify NBPII Littleton LLC, or variations of that entity name, as the property owner. Upon information and belief, ownership, management, development, and operational control of the Property have been exercised through NBPII Littleton LLC, LML Littleton LLC, and their common manager, NorthBridge Partners LLC. The precise allocation of ownership interests, authority, and environmental responsibilities among those affiliated entities is not ascertainable from publicly available records and is uniquely within Defendants' possession and control. Discovery is required to determine the full nature of those relationships.

314.    During their ownership and redevelopment of the Compaq/HP Facility, the NorthBridge Defendants exercised control over site conditions, demolition and redevelopment activities, permitting, construction, environmental compliance, and improvements to the facility.

315.    The NorthBridge Defendants acknowledged in agreements with the Town of Littleton that the Property lies within a protected aquifer and groundwater-resource area serving municipal drinking-water supplies. The Compaq/HP Facility presently owned and/or controlled by the NorthBridge Defendants is the same industrial facility and source area from which the releases of PFOA and PFOS alleged herein occurred

316.    The Compaq/HP Facility constitutes a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9). As alleged herein, PFOA and PFOS have been released and threatened to be released at and from the Compaq/HP Facility. Upon information and belief, one or more of the NorthBridge Defendants presently owns and/or controls the Compaq/HP Facility. To the extent LML is the current owner of the Compaq/HP Facility, LML is a covered person under CERCLA §107(a)(1), 42 U.S.C. §9607(a)(1). To the extent any other NorthBridge Defendant presently owns

or exercises ownership authority over the Compaq/HP Facility, such Defendant likewise constitutes a covered person under CERCLA §107(a)(1). Discovery is necessary to determine the precise ownership and control relationships among the NorthBridge Defendants.

**D.    30 Porter Road, Littleton, Massachusetts 01460**

317.    Lau Acquisition Corp. d/b/a Lau Technologies including its affiliates and divisions (collectively, "Lau"), owned, leased, operated, and/or conducted industrial operations at the facility located at or near 30 Porter Road in Littleton, Massachusetts (the "Lau Facility") from at least the late 1990s through the 2000s and into the 2010s. Upon information and belief, Lau dissolved in December 2024. Among those affiliates was Lau Defense Systems, LLC, a Massachusetts limited liability company organized in July 1998 and dissolved in 2009.

318.    During that period, Lau used the Lau Facility for electronics manufacturing, systems integration, and defense-related production, including fabrication, assembly, coating, cleaning, testing, and handling of electronic and microwave components and systems.

319.    **Defendant CURTISS WRIGHT CORPORATION** is a corporation organized under the laws of the State of Delaware with its principal place of business outside the Commonwealth of Massachusetts. Curtiss-Wright Corporation may be served through its registered agent, United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington DE 19803.

320.    **Defendant CURTISS-WRIGHT CONTROLS, INC.** ("Curtiss-Wright Controls") is a Delaware corporation organized on November 9, 1981 and authorized to transact business in Massachusetts from December 5, 2001 through April 20, 2016. Public corporate records identify Curtiss-Wright Controls' Massachusetts office as 30 Porter Road, Littleton, Massachusetts, the location of the Lau Facility. Curtiss-Wright Controls may be served through its registered agent, United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington DE 19803.

321. Upon information and belief, on or about November 2, 2001, Curtiss Wright Corporation acquired all interests in Lau Defense Systems, LLC ("Lau Defense Systems") and the stock of Vista Controls, Inc. ("Vista Controls") from entities affiliated with Lau for approximately $41 million in cash and assumption of debts and liabilities, and thereafter continued substantially the same operations at the Lau Facility.

322. By virtue of the acquisition, Curtiss-Wright Corporation, directly and through Curtiss-Wright Controls, Inc. and related subsidiaries, acquired, integrated, and continued the Lau Defense Systems and Vista Controls product lines, operations, technical capabilities, engineering functions, intellectual property, manufacturing activities, customer relationships, and facilities, including the Lau Facility at 30 Porter Road. Upon information and belief, Curtiss-Wright Controls thereafter operated and continued substantially the same defense-electronics, circuit-board, microwave, communications, control-system, and embedded-computing operations previously conducted by Lau until approximately 2012.

323. That is, at all relevant times, Curtiss Wright Corporation, directly and through its divisions, subsidiaries, and related entities, has been engaged in the design, manufacture, and supply of aerospace and defense systems and related products.

324. Lau designed, manufactured, assembled, integrated, and tested defense-electronics, microwave, communications, embedded-computing, circuit-card, and control-system technologies for military and government customers. These operations included the design and manufacture of printed circuit boards, multilayer circuit-card assemblies, high-frequency electronic interconnects, microwave and RF systems, specialized connectors, backplanes, signal-transmission architectures, electronic packaging systems, thermal-management assemblies, and related high-reliability

electronic components requiring specialized dielectric materials, coatings, cleaning processes, insulation systems, and performance-enhancing materials.

325.    These operations involved the use, handling, storage, and disposal of PFAS-containing materials, including PFOA, PFOS, fluorotelomer-based compounds, and related precursors used as surfactants, processing aids, coatings, and performance additives.

326.    Such PFAS-containing materials included, by way of example, fluorosurfactant and fluoropolymer products marketed under trade names such as Zonyl and Capstone, as well as PTFE and related fluoropolymer chemistries used in coatings, dielectric materials, insulation, and component fabrication.

327.    Industry literature and Curtiss-Wright Controls' own patent portfolio reflect substantial involvement in advanced electronics and circuit-board technologies commonly associated with fluoropolymer and fluorosurfactant chemistries (i.e., PFAS). For example, patents assigned to Curtiss-Wright Controls, Inc. describe high-frequency printed-circuit-board architectures incorporating multilayer circuit boards, conductive-via systems, differential signal pathways, backplanes, plug-in modules, mezzanine modules, dielectric regions, RF signal-transmission structures, and advanced electronic interconnect technologies. *See, e.g.,* U.S. Patent No. 9,560,741, Circuit Board Via Configurations for High Frequency Signaling (assigned to Curtiss-Wright Controls, Inc.); U.S. Patent No. 9,986,634, Circuit Board Via Configurations for High Frequency Signaling (assigned to Curtiss-Wright Controls, Inc.). Such technologies are commonly associated with the use of fluoropolymer-based laminates, PTFE dielectric materials, fluorinated insulation systems, fluorinated coatings, fluorinated lubricants, fluorinated thermal-management materials, and fluorinated cleaning chemistries historically used throughout the aerospace, military-electronics, RF, and microwave-electronics industries.

328. Lau and later Curtiss-Wright's operations further involved the use of PFAS-containing or PFAS-compatible solvents, degreasers, lubricants, thermal management fluids, and precision cleaning agents, which generated PFAS-bearing wastes including process wastewater, rinse water, spent solvents, and contaminated residuals.

329. Upon information and belief, and based upon the nature of the defense-electronics, microwave-systems, and circuit-assembly operations conducted at the Facility, Lau's operations, and later Curtiss-Wright Controls', involved PFAS-containing materials, including PFOA and PFOS, across multiple core processes, including:

    a. Flux Cleaning and Solvents: Rosin-based soldering flux used in high-reliability circuit assembly requires post-solder cleaning with specialized solvents, historically including PFAS-based fluorinated solvents such as those marketed as Novec™, Galden®, and Opteon™, which were used in parts washing, ultrasonic cleaning, and vapor degreasing systems and generated PFAS-containing wastewater, solvent waste, and air emissions;

    b. Vapor Phase Soldering: High-reliability soldering processes utilized PFAS-based perfluoropolyether ("PFPE") heat transfer fluids, including Galden® formulations, resulting in PFAS-containing waste streams;

    c. Conformal Coatings: Circuit assemblies were treated with PFAS-containing fluoropolymer coatings, including PTFE-based and related formulations, to provide environmental protection under military operating conditions;

    d. PCB Materials and Substrates: Printed circuit boards incorporated PFAS-containing materials, including epoxy laminates and PTFE-based substrates used for dielectric performance in high-frequency applications;

e. Wiring and Cable Fabrication: Military-specification wiring utilized PTFE-insulated conductors, which contain residual PFAS and generated PFAS-containing scrap and waste during fabrication; and

f. Lubricants and Maintenance Chemicals: Facility operations employed PTFE-based lubricants, fluorinated greases, and related PFAS-containing maintenance materials.

330. These uses collectively involved the routine handling, processing, and disposal of PFAS-containing materials at the Lau Facility and generated multiple PFAS-bearing waste streams, including PFOA and PFOS, such as process wastewater, solvent waste, air emissions, and solid waste.

331. Historical environmental investigations documented the presence of industrial contaminants in groundwater beneath the Lau Facility, including tetrachloroethene and fluorinated chlorofluorocarbons associated with electronic-parts cleaning and precision-equipment drying operations. Environmental consultants identified dichlorotrifluoroethane ("DCTFE") and trichlorotrifluoroethane ("TCTFE"), fluorinated compounds historically used in electronics manufacturing and precision-cleaning applications, in groundwater monitoring wells at the Facility, demonstrating that industrial chemicals associated with electronics-production activities entered groundwater beneath the Lau Facility.

332. In the course of its operations, Lau and Curtiss-Wright Controls disposed of, discharged, spilled, or otherwise released PFAS, including PFOA and PFOS, into the environment through multiple pathways, including:

a. releases associated with manufacturing operations, including the use, handling, storage, transfer, cleaning, maintenance, disposal, and management of PFAS-

containing materials, fluorinated fluids, process chemicals, solvents, wastewater-handling systems, floor drains, sinks, wash stations, on-site septic systems, piping, and related industrial infrastructure through which contaminants could enter soils and groundwater;

b. spills, leaks, and handling losses associated with solvents, coatings, and treatment chemicals;

c. disposal of PFAS-containing solid waste, including electronic components, fluoropolymer materials, and contaminated media;

d. air emissions and particulate deposition from heating, coating, soldering, and processing activities; and

e. stormwater runoff from areas where PFAS-containing materials and wastes were stored, handled, or exposed to precipitation.

333. These releases resulted in the infiltration of PFAS, including PFOA and PFOS, into soil and groundwater at and around the Lau Facility.

334. The Lau Facility is situated above extensive glacial outwash deposits consisting primarily of sands and gravels that facilitate groundwater infiltration and contaminant migration. Environmental investigations determined that permeable outwash deposits extend to depths of approximately 40 to 85 feet beneath the Lau Facility and form hydraulically connected groundwater pathways capable of transporting contaminants released at the facility. Investigators further determined that groundwater beneath the Lau Facility is replenished through natural recharge and on-site infiltration sources, including septic-system recharge, thereby facilitating the movement of contaminants from surface and subsurface releases into groundwater. Environmental investigations determined that groundwater beneath the Lau Facility flows generally from the

south and southwest in a northerly to easterly direction. Investigators further concluded that groundwater originating in the vicinity of the Lau Facility migrates downgradient toward Beaver Brook to the north and toward Mill Pond to the east.

335. The Lau Facility is squarely within the MassDEP approved Zone II wellhead-protection area for Littleton's Whitcomb Avenue Wells and Beaver Brook Wellfield (the "Whitcomb/Beaver Brook Wells"). A Zone II represents the portion of an aquifer that contributes groundwater to a public-supply well under pumping conditions and is specifically delineated to identify areas from which contaminants may migrate to the well. Groundwater recharge occurring beneath the Lau Facility contributes directly to the aquifer captured by the Whitcomb/Beaver Brook Wells. Releases occurring within that capture zone were therefore foreseeably transported toward municipal drinking-water wells used by Littleton.

336. PFAS, including PFOA and PFOS, released at the Lau Facility are highly persistent, mobile, water-soluble, and resistant to degradation. Once released to soil, stormwater, wastewater, or shallow groundwater, PFAS, including PFOA and PFOS, readily migrate through groundwater systems and can travel substantial distances along hydraulic gradients.

337. Upon information and belief, PFAS, including PFOA and PFOS, released from the Lau Facility infiltrated surrounding soil and groundwater and/or entered adjacent drainage features, wetlands, Beaver Brook, Mill Pond, and interconnected groundwater systems. Because Beaver Brook and surrounding wetlands are hydraulically connected to groundwater systems and municipal wellhead-protection areas serving Littleton's public water supply, PFAS, including PFOA and PFOS, released from the Lau Facility migrated through interconnected groundwater and surface-water pathways into Zone II capture areas and aquifers supplying Littleton's municipal

drinking-water wells, where they contributed to the commingled PFAS contamination detected in those wells.

338.    Releases of PFAS-bearing wastewater, including PFOA and PFOS, rinse water, solvent residues, fluoropolymer wastes, contaminated stormwater, and airborne particulate deposition from Facility operations entered surrounding soil, groundwater, drainage features, and surface-water systems. Because the Lau Facility is located within and/or hydraulically upgradient of groundwater recharge and capture areas associated with Littleton's municipal wells, contamination released from the Lau Facility foreseeably migrated toward and impacted those public drinking-water sources.

339.    The PFAS-containing materials used at the Lau Facility included fluorotelomer-based compounds and other PFAS precursors that degrade and transform in the environment into perfluoroalkyl acids, including PFOA, PFOS, and related terminal degradation products. As a result, releases of precursor compounds at the Facility would foreseeably result in the presence of PFOA and PFOS and related degradation products in downgradient groundwater.

340.    Curtiss-Wright Controls' patent filings, and patent filings assigned to entities within Curtiss-Wright's defense-electronics business following the acquisition of Lau Defense Systems and Vista Controls, reflect the continuation and development of sophisticated aerospace and defense-electronics technologies. These patents describe, among other things, multilayer printed circuit boards, conductive-via architectures, differential signal pathways, high-frequency signal-transmission systems, backplanes, plug-in modules, mezzanine modules, electrical connector assemblies, EMI/RFI shielding systems, including technologies designed for harsh-environment aerospace, military, and industrial application, conduction-cooled circuit-card enclosures, and other advanced electronic packaging technologies. *See, e.g.*, U.S. Patent No.

69

9,560,741, Circuit Board Via Configurations for High Frequency Signaling; U.S. Patent No. 9,986,634, Circuit Board Via Configurations for High Frequency Signaling; U.S. Patent Application Publication No. 2014/0377985, Electrical Connector Assembly With Environmental Shield; and Curtiss-Wright patents relating to conduction-cooled circuit-card enclosures and high-performance electronic packaging. These technologies historically employed and continue to employ specialized dielectric materials, fluoropolymer laminates, PTFE-insulated wiring, fluorinated coatings, fluorinated lubricants, fluorinated thermal-management materials, and fluorinated cleaning chemistries widely used throughout the aerospace, military-electronics, RF, microwave-electronics, and advanced circuit-board industries.

341. Curtiss-Wright Corporation is liable as a corporate successor for the acts and omissions of Lau relating to the Lau Facility, operations, discharges, and releases described in this Complaint.

342. Through the acquisition and subsequent continuation of operations at the Lau Facility, Curtiss-Wright Corporation and Curtiss-Wright Controls expressly or impliedly assumed liabilities associated with the Lau Defense Systems and Vista Controls operations relevant to the contamination and injuries alleged herein, including liabilities arising under CERCLA and applicable state law.

343. In the alternative, and to the extent recognized under applicable state law, Curtiss-Wright Corporation and Curtiss-Wright Controls are liable under the product-line and/or de facto-merger exceptions to the general rule of non-liability for asset purchasers because, among other things, Curtiss-Wright Corporation and Curtiss-Wright Controls: (a) acquired substantially all of the assets necessary to continue the Lau Defense Systems and Vista Controls product lines; (b) continued those product lines under its own name and through its own divisions or subsidiaries;

and (c) benefited from the goodwill and customer base associated with the Lau Defense Systems and Vista Controls businesses.

344. Following the acquisition, Curtiss-Wright Controls owned, operated, managed, and/or conducted operations at the Facility and independently contributed to the release of PFAS, including PFOA and PFOS, through its continued operations.

345. PFOA and PFOS are hazardous substances within the meaning of 42 U.S.C. § 9601(14).

346. Lau, Curtiss-Wright Corporation, and Curtiss-Wright Controls are "covered persons" under 42 U.S.C. § 9607(a), including as owners and/or operators of a facility and/or persons who arranged for disposal of hazardous substances.

347. Lau, Curtiss-Wright Corporation, and Curtiss-Wright Controls released or caused the release of hazardous substances, including PFOA and PFOS, into the environment at the Lau Facility, resulting in contamination of groundwater supplying Littleton's public drinking water wells.

348. These releases have caused Littleton to incur necessary response costs consistent with the National Contingency Plan.

349. Lau, Curtiss-Wright Corporation, and Curtiss-Wright Controls' releases were a substantial factor in causing the contamination of Littleton's drinking water supply and, at a minimum, contributed to an indivisible injury consisting of commingled PFAS contamination, including PFOA and PFOS, within the aquifer.

350. At all relevant times, Lau, Curtiss-Wright Corporation, and Curtiss-Wright Controls knew or should have known that PFAS used in their operations were persistent, mobile,

and capable of contaminating groundwater and drinking water supplies, and that releases at the Lau Facility would foreseeably impact nearby public water wells.

351.    Upon information and belief, Lau and Curtiss-Wright Controls' operations at the Lau Facility included the manufacture and integration of electronic and microwave systems for defense and government applications, including work performed as a contractor or subcontractor to agencies of the United States Department of Defense. Such work did not require, and was not directed by the government to require, the use, handling, or disposal of PFAS-containing materials in the manner alleged herein. Rather, the selection, use, handling, and disposal of PFAS-containing chemicals—including fluorosurfactants, coatings, solvents, and processing aids—were within the control and discretion of Lau and its successors and were carried out in accordance with Defendants' own manufacturing processes, procurement decisions, and environmental management practices.

352.    As an aerospace-electronics design, manufacturing, and testing operation, the Defendants Lau, Curtiss-Wright Corporation, and Curtiss-Wright Controls knew or should have known that the manufacture and assembly of high-frequency circuit boards, electronic interconnect systems, connector assemblies, microwave systems, circuit-card assemblies, thermal-management systems, and related defense-electronics technologies generated wastes associated with coatings, solvents, cleaning agents, insulation materials, lubricants, and other industrial chemicals capable of contaminating soil and groundwater. The Lau Defendants' and Curtiss-Wright's patent portfolios confirm their involvement in precisely these categories of advanced electronics technologies, including high-frequency printed-circuit-board architectures, electronic interconnect systems, circuit-card assemblies, connector technologies, and advanced electronic packaging systems for aerospace, military, communications, and high-reliability electronic applications.

72

353.     **Defendant 30 PORTER LLC** ("30 Porter Road")**,** is a Massachusetts limited liability company, with a principal office located at 341 Marlborough Street - Unit 4, Boston, Massachusetts. 30 Porter's resident agent is Theodore M. Romanow, 346 University Avenue, Westwood MA 02090.

354.     30 Porter Road is the current owner of the Lau Facility. On or about July 29, 2011, 30 Porter Road acquired title to the Lau Facility by quitclaim deed, for consideration of approximately $2,100,000, recorded at the Middlesex South Registry of Deeds at Book 57217, Page 404.

355.     The Lau Facility constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9). Hazardous substances, including PFOA and PFOS, have been released and are threatened to be released from the Lau Facility into soil, groundwater, surface water, and other environmental media.

356.     As the current owner of a facility from which there has been a release and threatened release of hazardous substances, 30 Porter Road is a "covered person" within the meaning of 42 U.S.C. § 9607(a)(1) and is jointly and severally liable for all response costs incurred and to be incurred in connection with investigation, monitoring, assessment, containment, remediation, treatment, and other necessary response actions relating to hazardous substances released from the Lau Facility.

### E.  59 Porter Road, Littleton, Massachusetts

357.     **Defendant DIAMOND ANTENNA AND MICROWAVE CORPORATION** ("Diamond") is a corporation organized under the laws of Delaware with its principal place of business at 59 Porter Road, Littleton, Massachusetts (the "Diamond Facility"). Diamond is registered to conduct business in Massachusetts and operates industrial manufacturing and

engineering activities at the Diamond Facility. Its resident agent is Corporation Service Company, 251 Little Falls Drive, Wilmington DE 19808.

358.    Upon information and belief, Diamond has owned, leased, operated, maintained, controlled, and/or conducted industrial operations at the Diamond Facility since at least 2004.

359.    Diamond designs, engineers, develops, manufactures, assembles, tests, repairs, refurbishes, and distributes radiofrequency ("RF"), microwave, radar, communications, antenna, and electromechanical systems, including rotary joints, electrical transfer assemblies, waveguide systems, antenna components, microwave transmission components, and related products utilized in aerospace, defense, naval, communications, radar, satellite, and industrial applications.

360.    Diamond's products and manufacturing operations require materials capable of providing exceptional dielectric performance, thermal stability, wear resistance, chemical resistance, and long-term durability under demanding operating conditions. Upon information and belief, Diamond utilizes fluoropolymer materials, including PTFE (Teflon) and related fluorinated compounds, in dielectric components, bushings, bearings, insulators, seals, lubricated assemblies, coatings, and other high-performance electromechanical applications.

361.    Diamond's own patent portfolio demonstrates that the Company designed, developed, and manufactured proprietary rotating electrical transfer systems, antenna systems, radar components, communications equipment, and electromechanical assemblies intended for aerospace, defense, naval, radar, communications, and related applications. Diamond and its affiliated entities obtained numerous patents directed to rolling electrical transfer couplings, rotating electrical transfer components, and rotary electrical transfer devices designed to transmit electrical power and signals across continuously rotating interfaces, including U.S. Patent Nos. 6,582,237, 7,163,403, and 7,946,851, as well as corresponding foreign patents including EP

1,490,930 B1 and CN101558533A. These patented technologies were developed for radar systems, ship antennas, communications equipment, and other demanding electromechanical applications.

362.    Diamond's patented technologies repeatedly address engineering challenges involving friction, wear, debris, contamination sensitivity, electrical-transfer reliability, environmental durability, current-transfer capacity, and long-term operational performance. Diamond's patents specifically identify the need to reduce wear debris, minimize contamination-related electrical degradation, improve reliability in severe operating environments, increase service life, and provide reliable operation through hundreds of millions of rotational cycles. *See, e.g.*, U.S. Patent No. 6,582,237; EP Patent No. 1,490,930 B1. These patents further demonstrate Diamond's extensive focus on material selection and interface design for high-performance rotating electromechanical systems.

363.    Diamond's affiliated patent portfolio also demonstrates the use of PFAS materials in products developed for such applications. In U.S. Patent No. 7,946,851, assigned to Diamond-Roltran, LLC, a Diamond-affiliated entity, Diamond disclosed that a bushing incorporated into a patented rotating electrical transfer assembly "may be made of an anti-friction, low-wear plastic, such as Delrin or Teflon." Teflon is a fluoropolymer PFAS material commonly utilized because of its low-friction characteristics, wear resistance, dielectric properties, thermal stability, and chemical resistance. Diamond's disclosure of Teflon as a suitable component material demonstrates knowledge of fluoropolymer materials and their desirable performance characteristics in rotating electromechanical systems.

364.    Diamond's patents further demonstrate deliberate selection of specialized conductive, dielectric, elastomeric, and insulating materials for use in electrical transfer

assemblies. Diamond identified materials including microporous copolymers, silicone rubber, molybdenum, copper-clad molybdenum, Paliney 7 alloy, stainless steel, beryllium copper, plastic materials, and G-10 fiberglass dielectric barriers for use in its patented designs. *See* U.S. Patent No. 6,582,237 and EP Patent No. 1,490,930 B1. These disclosures demonstrate Diamond's sophisticated materials-engineering capabilities and support the conclusion that Diamond selected and utilized specialized fluoropolymer materials where those materials provided desirable electrical, dielectric, wear-resistant, or low-friction performance characteristics.

365. Diamond's patents therefore demonstrate institutional knowledge regarding fluoropolymer materials and their performance characteristics and further support the conclusion that Diamond utilized fluoropolymer materials, including PTFE and related PFAS-containing compounds, in the design, manufacture, assembly, testing, maintenance, and repair of products developed and manufactured at the Diamond Facility. Upon information and belief, those activities generated PFAS-containing wastes, residues, scrap materials, contaminated equipment, wastewater, stormwater discharges, and other waste streams.

366. Diamond's manufacturing operations further involved the use, handling, storage, machining, assembly, integration, testing, maintenance, repair, and disposal of PFAS-containing materials and products, including fluoropolymer components, fluorinated lubricants and greases, fluorinated coatings, fluorinated processing aids, and PFAS-containing chemical formulations utilized in electronics and precision manufacturing operations.

367. Diamond's aerospace, defense, radar, microwave, communications, and electromechanical manufacturing operations generated opportunities for releases of PFAS, including PFOA, PFOS, and related compounds, through routine manufacturing activities,

equipment cleaning, waste handling, material storage, disposal practices, stormwater transport, spills, leaks, emissions, and other releases to the environment.

368.    In the ordinary course of its operations at the Diamond Facility, Diamond released and/or caused the release of PFAS and PFAS-containing materials into the environment, including through:

      a.  industrial process wastewater and equipment-cleaning discharges;

      b.  spills, leaks, handling losses, and accidental releases of PFAS-containing materials and chemicals;

      c.  disposal of PFAS-containing wastes, fluoropolymer materials, contaminated equipment, scrap materials, and manufacturing residues;

      d.  air emissions and particulate deposition associated with manufacturing, machining, fabrication, and related industrial processes; and

      e.  stormwater runoff from areas where PFAS-containing materials, wastes, and equipment were stored, handled, or managed.

369.    These releases resulted in the contamination of soil, groundwater, surface water, sediments, and other environmental media at and surrounding the Diamond Facility.

370.    PFAS are highly persistent, mobile, and resistant to natural degradation. Once released into the environment, PFAS readily migrate through soil and groundwater and can travel substantial distances while remaining capable of contaminating drinking-water supplies.

371.    The Diamond Facility is located within the Porter Road industrial corridor in Littleton, Massachusetts, an area containing numerous industrial and commercial facilities identified during PFAS source-screening and source-evaluation efforts.

372.    The Diamond Facility is located squarely within the MassDEP-approved Zone II wellhead protection area for Littleton's Whitcomb Avenue Wells and Beaver Brook Wellfield (the "Whitcomb/Beaver Brook Wells"). Zone II areas constitute the primary recharge areas contributing groundwater to public water-supply wells. Groundwater and contaminants released within those recharge areas are captured by and migrate toward the Whitcomb/Beaver Brook Wells. PFAS-containing substances released from the Diamond Facility into soil, groundwater, stormwater systems, wastewater systems, or the subsurface environment were therefore released directly within the recharge area and capture zone of Littleton's drinking-water supply and were subject to migration toward and into the Whitcomb/Beaver Brook Wells. Groundwater recharge occurring beneath the Diamond Facility contributes directly to the aquifer captured by the Whitcomb/Beaver Brook Wells. Releases occurring within that capture zone were therefore foreseeably transported toward municipal drinking-water wells used by Littleton.

373.    Upon information and belief, PFAS, including PFOA and PFOS, released from the Diamond Facility infiltrated soil and groundwater beneath the Facility and migrated through connected groundwater pathways into aquifers, recharge areas, and groundwater capture zones supplying Littleton's municipal drinking-water system, thereby contributing to PFAS contamination detected in the Town's public drinking-water supplies.

374.    Upon information and belief, releases from the Diamond Facility have commingled with releases from other industrial facilities located within the same industrial corridor and groundwater system, collectively contributing to PFAS contamination impacting Littleton's drinking-water resources.

375.     PFAS, including PFOA and PFOS, are hazardous substances within the meaning of CERCLA, 42 U.S.C. § 9601(14), and/or were constituents of hazardous substances released at the Diamond Facility.

376.     Diamond is a "covered person" within the meaning of 42 U.S.C. § 9607(a), including as an owner and/or operator of a facility from which hazardous substances were released and/or a person who arranged for disposal or treatment of hazardous substances.

377.     Diamond released and/or caused the release of hazardous substances, including PFOA, PFOS, and other PFAS, into the environment at and from the Diamond Facility.

378.     As a direct and proximate result of those releases, the Town has incurred and continues to incur necessary response costs consistent with the National Contingency Plan, including investigation, monitoring, assessment, sampling, treatment, remediation, engineering, design, construction, operation, maintenance, and other response actions.

379.     Diamond is jointly and severally liable for such response costs and all other relief available under CERCLA.

380.     Diamond knew or reasonably should have known that fluoropolymer materials, including PTFE and related PFAS-containing compounds, were persistent in the environment, capable of contaminating soil, groundwater, surface water, and drinking-water supplies, and likely to migrate beyond facility boundaries if released. Diamond's patent portfolio—including U.S. Patent Nos. 6,582,237, 7,163,403, and 7,946,851, together with corresponding foreign patents including EP 1,490,930 B1 and CN101558533A—demonstrates extensive technical knowledge regarding material selection, wear resistance, contamination control, dielectric performance, durability, and long-term operation of high-performance radar, communications, antenna, and electromechanical systems.

381.     Upon information and belief, Diamond manufactured products for commercial customers and agencies of the United States Government, including defense and military applications. Any use, handling, storage, treatment, disposal, release, or environmental management of PFAS-containing materials at the Diamond Facility resulted from Diamond's own procurement, manufacturing, operational, engineering, and waste-management decisions and was not specifically directed, required, or controlled by the United States Government.

382.     **Defendant ARTEMIS CAPITAL PARTNERS III, L.P.** ("Artemis Capital") is a Delaware limited partnership registered to conduct business in Massachusetts. Its principal place of business is 160 Federal Street, 23rd Floor, Boston, Massachusetts 02110. Its resident agent is Corporation Service Company, 251 Little Falls Drive, Wilmington DE 19808.

383.     Upon information and belief, in or around November 2024, Artemis Capital and/or affiliated entities acquired Diamond and continue to own, directly or indirectly, Diamond and its operations as an ongoing enterprise.

384.     Upon information and belief, Artemis Capital currently exercises ownership authority and control over Diamond's business operations, assets, management, and activities conducted at the Diamond Facility.

385.     In addition, Artemis Capital is liable as a successor to Diamond's prior operations because, upon information and belief:

    a.   they acquired substantially all assets and ongoing business operations of Diamond;

    b.   they have continued the same or substantially similar manufacturing operations at the Facility;

    c.   there is continuity of enterprise, including operations, workforce, and customer base; and/or

    d.   the transaction constitutes a de facto merger or mere continuation of the prior enterprise.

386. Upon information and belief, Artemis Capital has continued Diamond's operations at the Diamond Facility as a going concern following the acquisition and have continued to own and/or operate a facility from which hazardous substances have been released into the environment.

387. Artemis Capital is liable under CERCLA, including as current owners and/or operators of a facility from which hazardous substances have been released.

388. **Defendant 59P, LLC** ("59P"), is a Delaware limited liability company organized on April 11, 2024 and registered to transact business in the Commonwealth of Massachusetts on August 29, 2024. Its principal office is located at 49 Junction Square Drive, Concord, Massachusetts 01742, and may be served through its registered agent, The Corporation Trust Company, 1209 North Orange Street, Wilmington DE 19801. Upon information and belief, 59P was formed for the purpose of acquiring and holding title to commercial real property, including the Diamond Facility.

389. On or about October 8, 2024, 59P acquired title to the Diamond Facility located at 59 Porter Road, Littleton, Massachusetts, by Quitclaim Deed from Spound Development Associates, LLC for consideration of approximately $4,000,000, recorded with the Middlesex South Registry of Deeds at Book 83324, Page 344.

390. Upon information and belief, 59P acquired the Diamond Facility with the ability to investigate environmental conditions affecting the property and continues to exercise ownership and control over the Diamond Facility. Publicly available site development documents prepared after the acquisition identify 59P as the owner of the property.

391. The Diamond Facility constitutes a "facility" within the meaning of 42 U.S.C. § 9601(9). Hazardous substances, including PFOA and PFOS, have been released and are threatened to be released from the Diamond Facility into soil, groundwater, surface water, and other environmental media.

392. As the current owner of a facility from which there has been a release and threatened release of hazardous substances, 59P is a "covered person" within the meaning of 42 U.S.C. § 9607(a)(1).

393. Pursuant to 42 U.S.C. § 9607(a)(1), 59P is jointly and severally liable for all response costs incurred and to be incurred in connection with investigation, monitoring, assessment, containment, remediation, treatment, and other necessary response actions relating to hazardous substances released from the Facility.

## FIRST CAUSE OF ACTION
### Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)

394. Littleton incorporates by reference the preceding paragraphs as though fully set forth herein.

395. To the extent Littleton seeks recovery under CERCLA, such claims are limited to response costs incurred as a result of releases of PFOA and PFOS, the hazardous substances designated under CERCLA.

396. Under CERCLA, 42 U.S.C. §§ 9601, *et seq.*, certain categories of persons, including owners and operators of facilities, are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation. 42 U.S.C. § 9607(a).

397. Littleton is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

398.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

399.    Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

400.    Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

401.    CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…."  42 U.S.C. § 9601(22).

402.    PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

403.    There have been "releases", and/or continue to be releases, and/or disposal of PFOA and PFOS from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).  Upon information and belief, these releases or threatened releases are ongoing.

404.    The hazardous substances released from Defendants' facilities were, and are being, released within or migrated to Littleton's Water Source.

405.    Littleton has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances from Defendants' facilities.

406.    Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator

of a facility from which there was a release of hazardous substances that have contaminated Littleton's public drinking water supply.

407. By reason of the foregoing, Defendants are liable, jointly and severally, for Littleton's necessary response costs, and damages regarding contamination to Littleton's public water supply from PFOA and PFOS.

## SECOND CAUSE OF ACTION
### Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)

408. Littleton incorporates by reference the preceding paragraphs as though fully set forth herein.

409. In any cost recovery action under 42 U.S.C. §§ 9607(a), "the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

410. As set forth above, Defendants are liable under CERCLA §107(a), 42 U.S.C. §9607(a) for releases and threatened releases of hazardous substances that have caused Littleton to incur necessary response costs.

411. Littleton has incurred, and will continue to incur, necessary response costs, including costs associated with investigating, monitoring, evaluating, treating, containing, removing, and remediating contamination affecting its public water supply.

412. Plaintiff's response costs are, and future response costs will be, consistent with the National Contingency Plan, 40 C.F.R. Part 300.

413. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Littleton is entitled to a declaratory judgment on liability for response costs

or damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances, *i.e.*, PFOA and PFOS, in Littleton's public drinking water supply as referenced herein.

414.    A declaratory judgment will prevent the need for multiple lawsuits as Littleton continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

415.    A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

416.    Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Littleton's public drinking water supply.

417.    Littleton will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances.

418.    Littleton's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

419.    Littleton is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## THIRD CAUSE OF ACTION
### Continuing Public Nuisance

420. Littleton incorporates by reference the preceding paragraphs as though fully set forth herein.

421. Littleton, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

422. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

423. Littleton supplied a clean, safe, portable source of water until it was discovered that PFAS contamination had migrated to Littleton's water supply.

424. Defendants by their negligent, reckless, and willful acts have caused the release of PFAS from their facilities that, because their facilities are located within the source water protection area for Littleton's Water Source, and PFAS released from them migrated into Littleton's Water Source.

425. Defendants released PFAS through direct discharge, water emissions, air deposition, spills, runoff, during defendants' respective manufacturing or operations, and as part of industrial wastewater and solid waste.

426. By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Littleton's special status and authority regarding its natural resources; (iii) Littleton's ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people and its citizens to enjoy their natural resources from interference by pollution and contamination.

427.     Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

428.     The public nuisance caused by the presence of PFAS in Littleton's drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

429.     The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Littleton, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

430.     Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS into natural resources and Littleton's Water Source would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of vital groundwater resources relied upon by Littleton and the public.

431.     As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Littleton has incurred substantial damages, and will incur additional damages to remove PFAS from the public water supply so Littleton can provide its residents and consumers with clean and healthy water.

432.     The interference with Littleton's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

433.     As a direct result of the foregoing, Littleton seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**FOURTH CAUSE OF ACTION**
**Continuing Trespass**

434.    Littleton incorporates by reference the preceding paragraphs as though fully set forth herein.

435.    Littleton is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Littleton's Water Source and delivering drinking water to the residents and users of it.

436.    Defendants intentionally engaged in the actions that caused the release of PFAS from their facilities.

437.    Upon information and belief, Defendants knew, or should have known, that PFAS contamination migrated through groundwater and surface water contaminating Littleton's real property used for collecting, treating, and delivering drinking water and the drinking water itself.

438.    Defendants did not and do not have authority, privilege, or permission to trespass upon Littleton's property interests.

439.    The acts and omissions of Defendants caused the PFAS contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, the Nashua River and its tributaries, and groundwater, contaminating Littleton's real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Littleton's right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Littleton's property and unlawful interference with Littleton's property rights.

440.    As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Littleton's property, in the form of the ongoing PFAS contamination of Littleton's water system, Littleton has incurred substantial damages and will incur additional damages to

remove PFAS from the public water supply in order to provide their residents and customers with clean and healthy water.

441.    As a direct result of the foregoing, Littleton seeks compensatory damages in a sum to be determined at the time of trial.

## FIFTH CAUSE OF ACTION:
### Negligence

442.    Littleton incorporates by reference the preceding paragraphs as though fully set forth herein.

443.    Defendants knew or should have known that PFAS and PFAS-containing products and materials, and other toxic chemicals, create a substantial risk of harm to groundwater and to members of the public who consume such groundwater.

444.    Defendants knew or should have known that the chemicals containing PFAS and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soil, surface waters, groundwater, the aquifer and therefore, Littleton's Water Source.

445.    Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS at and from their facilities and/or properties as to cause severe contamination of surface waters, soil, groundwater, and/or the aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

446.    Defendants owed Littleton a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFAS and other toxic chemicals into the soil, surface waters, and groundwater at their properties.

447.     Defendants owed Littleton a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS and other toxic chemicals into the hydrological features and into Littleton's Water Source.

448.     Defendants owed Littleton a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFAS from their facilities and/or properties.

449.     Upon learning of the release of solvents and compounds, including but not limited to PFAS containing products, PFAS, and other toxic chemicals, at their facilities and/or properties, Defendants owed Littleton a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Littleton's Water Source.

450.     Defendants breached the above duties and failed to prevent the releases of PFAS containing products at their properties.

451.     Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFAS and other toxic chemicals after they occurred.

452.     Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFAS and other toxic chemicals from their properties into Littleton's Water Source.

453.     As a result of Defendants' breaches of their duties, Littleton has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

454.     Defendants' respective breach of their duties was the direct, sole and proximate

cause of Littleton's damages.

455.    As a direct result of the foregoing, Littleton seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**SIXTH CAUSE OF ACTION:**
**Failure To Warn**

456.    Littleton incorporates by reference the preceding paragraphs as though fully set forth herein.

457.    Defendants breached their duty to notify and warn Littleton of the likelihood of release of hazardous substances, including but not limited to PFAS and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Littleton's Water Source.

458.    Upon learning of the release of hazardous substances, including but not limited to PFAS and/or products containing PFAS, and other toxic chemicals at their facilities and/or properties, Defendants owed Littleton a duty to timely notify and warn Littleton of the releases.

459.    Defendants breached that duty by failing to timely notify and warn Littleton of the releases of hazardous substances, including but not limited to PFAS and other toxic chemicals, on and under their properties and, consequently, into Littleton's Water Source.

460.    As a result of Defendants' breaches of their duty to warn Littleton, Littleton was forestalled from undertaking effective and immediate remedial measures, and Littleton has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

461.    As a direct and proximate result of Defendants' above-described failure to provide warnings, Littleton has incurred and will continue to incur the following damages:

    a.    Existing contamination of Littleton's water supply, which may have been prevented

91

or mitigated if timely warnings were given;

b. Costs of additional testing and monitoring of the hydrological features and Littleton's drinking water wells for hazardous substances, including but not limited to PFAS and other toxic chemicals' contamination;

c. Costs of investigations, risk assessment, and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFAS and other toxic chemicals;

d. Costs of treatment for hazardous substances, including but not limited to PFAS and other toxic chemicals, including design, installation and operation of remediation systems to remove PFAS to a safe level of non-detect;

e. Loss of water production capacity;

f. Diminished consumer confidence in Littleton's drinking water;

g. Potential cost to design and install replacement water sources;

h. Attorney fees and costs; and

i. Other compensatory damages.

462.    As a direct result of the foregoing, Littleton seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing claims, Plaintiff the Littleton Water District requests that the Court grants the following relief:[3]

1.    Find the Defendants liable, jointly and severally, for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances, including PFOA and PFOS, that have contaminated

---

[3] Plaintiff expressly disclaims recovery for PFAS contamination from aqueous film-forming foam (AFFF).

Littleton's public drinking water supply, and order Defendants to reimburse Littleton for its past, present, and future costs to investigate, monitor, evaluate, and remediate the PFAS that continues to migrate into Littleton's public water supply, including the costs of employing outside consultants and testing labs for these tasks.

2. Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS, including PFOA and PFOS, contamination in the Littleton Water District's public drinking water supply.

3. Award Littleton monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS contamination of the Littleton's public water supply.

4. Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Littleton to remove PFAS from the public water supply.

5. Award Littleton its reasonable attorney fees and legal expenses incurred in evaluating the PFAS contamination and prosecuting these claims.

6. Award Littleton such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Littleton Water District demands a trial by jury on all claims for which a jury trial is available.

Dated:  June 8, 2026

Respectfully submitted,

*/s/ Harold P. Naughton, Jr.*
Harold P. Naughton, Jr., Esq.
**NAPOLI SHKOLNIK PLLC**
PO Box 128
Clinton, MA 01510-0128
Tel. (212) 397-1000
HNaughton@napolilaw.com

James L. Simpson, Esq.
    *(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York, NY  10017-6502
Tel. (212) 397-1000
JSimpson@napolilaw.com

Paul J. Napoli, Esq.
    *(Pro Hac Vice Forthcoming)*
Cristina M. Rodriguez, Esq.
    *(Pro Hac Vice Forthcoming)*
**NS PR LAW SERVICES LLC**
    **d/b/a NAPOLI SHKOLNIK**
1302 Avenida Ponce de León
San Juan PR  00907-3982
Tel. (833) 271-4502
PNapoli@nsprlaw.com
CRodriguez@nsprlaw.com

***Counsel for Plaintiff***